In the Matter of BERKLEY
MULTI–UNITS, INC.,
Debtor.

Joseph A. GASSEN, Trustee for the Estate of Berkley Multi-Units,
Inc., Plaintiff,

v.

UNIVERSAL BUILDING MATERIALS,
INC., Defendant.

Bankruptcy No. 85–433.
Adv. No. 86–190.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Jan. 30, 1987.

See also, Bkrtcy., 55 B.R. 584, Bkrtcy.,
51 B.R. 400.

Roger Altman, for plaintiff.

Russell S. Bogue, III, for defendant.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

ALEXANDER L. PASKAY, Chief Judge.

THE MATTERS under consideration are a Renewed Motion for Summary Judgment filed by Joseph A. Gassen, Trustee (Trustee) for the estate of Berkley Multi-Units, Inc. (Debtor) and a Motion for Summary Judgment filed by Universal Building Materials, Inc. (Universal), the Defendant in the above-captioned adversary proceeding. The parties maintain there are no genuine issues of material fact in dispute and the matters herein can be determined as a matter of law. The stipulated facts relevant and germane to a resolution of this controversy are as follows:

On January 22, 1985, the Debtor entered into a contract for the purchase of the Sea Bonae Apartments (Sea Bonae) for the amount of $1,700,000.00 from Universal. The contract had an addendum. (Stip.Exh. A). The Purchase and Sale Contract called for a $400,000.00 cash down payment at closing, and the balance of $1,300,000.00

was to be secured by the execution of a Purchase Money First Mortgage by the Debtor in favor of Universal.

On January 28, 1985, representatives of both the Debtor and Universal, and their respective counsel, met at the offices of Suncoast Title in Boca Raton, Florida, for an escrow closing on the Sea Bonae. At that meeting, the parties executed several closing documents: (1) the Deed (Stip. Exh. B); (2) Preliminary Closing Statement (Stip. Exh. C); (3) Purchase Money Note and Mortgage (Stip. Exh. D); (4) Escrow Instructions (Stip. Exh. E); (5) and a Second Addendum to the Contract for Sale and Purchase (Stip. Exh. F). At the January 28, 1985, escrow closing, the Debtor paid Suncoast Title, the closing agent, the amount of $109,105.60 as a partial installment against the down payment, closing expenses and title insurance costs.

Thereafter, on February 14, 1985, Mr. Bryan Brody (Brody), attorney for Debtor, telephoned Mr. Charles Dale (Dale), attorney for Universal, and advised him that Suncoast Title was experiencing some problems. For this reason the parties orally agreed to modify the existing escrow agreement and to utilize Dale and his law firm's trust account to hold the funds due to the seller rather than the title company, as originally agreed upon. On February 15, 1985, Dale received three checks to be held in escrow pending the final closing of the Sea Bonae; one from the Suncoast Title Company in the amount of $100,061.16, which represented the sum of $100,000.00 given to the title company by the Debtor on January 28, 1985, plus interest but less $9,105.60 retained by Suncoast Title for Debtor's (only) recording expenses. The remaining two checks were issued by companies related to the Debtor in the amount of $100,000.00 each. Thus, at this point the total sum held in the trust account of Mr. Dale, counsel for Universal, was $300,-061.16; and of course, at this point is still shy of the down payment called for by the contract.

On February 18, 1985, Ms. Sylvia Schantz (Schantz), Vice-President of Universal, and Mr. Dale, and Mr. Brody, counsel for the Debtor, met for the purpose of determining the method and the extent of any adjustment of the original closing statement prepared at the January meeting (Stip. Exh. G). Pursuant to the agreed amended closing statement, Mr. Brody issued a check drawn on his trust account, a check payable to the trust account of Mr. Dale in the amount of $31,194.43, which was an additional installment payment towards the $400,000.00 down payment required by the Contract for Sale. The remaining $66,279.00, which remained to be paid was to be handled in the following fashion:

The parties agreed that out of this sum $51,000.00 would be paid directly to the real estate agent involved in the transaction for his commission, and the remaining funds were to be paid to Suncoast Title for payment of the costs connected with the ultimate closing; that is, recording the documents, and $5,000.00 of that amount would be retained by Mr. Brody in his trust account to take care of any additional items which may be due at the final closing based on additional prorations or possible additional modifications of the amounts on the final closing statement.

In addition, at this meeting the parties learned for the first time that there were some title problems which prevented Universal from conveying clear title of the subject property to the Debtor. Specifically, it appeared that the record title to at least a portion of the subject property was still held in the name of Universal's predecessor in interest, which entity was yet to be merged into Universal.

However, notwithstanding the fact that due to these problems no final closing occurred on February 18, 1985, Universal turned over the possession and control of the subject property to the Debtor, who assumed the operation of the facility on that date.

On February 25, 1985, the Debtor filed its Petition for Relief under Chapter 11 of the Bankruptcy Code. On the same date this Court entered its customary routine

order authorizing the Debtor to remain in possession and to continue to operate the business as Debtor-in-Possession. Although it is not relevant to the present controversy, it appears that at the time this Debtor filed his Chapter 11 Petition, the Debtor and other related entities also owned and operated approximately sixty (60) additional properties (Stip. Exh. I).

Dale in order to finalize this transaction forwarded certified copies of the certified merger documents to Suncoast Title for examination, and the representative of Suncoast title advised Dale that the merger documents were in order and that would take care of the title problem. However, Suncoast Title also advised Dale that it was unable to complete the transaction and finalize the closing because neither the Debtor nor its counsel, Mr. Brody, paid the sum of $10,279.00 needed to pay for the cost of recording and meet other closing costs, all of which, of course, had to be paid before the sale transaction could be finalized. At this point it appears that Dale was not aware of whether or not the $51,000.00 had been paid to the real estate agent, which was agreed upon by the parties at the February 18 meeting.

On March 29, 1985, Dale issued a check in the amount of $10,279.00 payable to Broward County Recording Division. This check was drawn on his trust account in which the funds received from Brody were deposited. Dale also instructed Suncoast Title to proceed and record all the appropriate documents. It is without dispute that the Deed, Note and Mortgage and Security Agreement were actually recorded in the public records on March 29, 1985. Several days thereafter Dale disbursed the remaining funds still held by him in escrow in the approximate amount of $300,000.00 to Universal and sent a demand letter to Brody requesting payment of the $10,279.00, which he advanced for documentary stamps and other costs needed for the recordation, which sum was required to be paid by the Debtor at the closing. No further formal meeting as such occurred between the parties concerning this sale of the subject property.

On May 6, 1985, Universal filed its first motion for relief from the automatic stay, which motion was refiled again on June 26, 1985, and Universal had requested an emergency hearing on its Motion to Terminate Automatic Stay. The motions were set down for hearing in due course, and at the conclusion of which this court on July 18, 1985, entered an Order Terminating the Automatic Stay and authorized Universal to institute a mortgage foreclosure proceeding in state court. On July 23, 1985, the Trustee who has been appointed in the interim for the estate of the Debtor and who took over the possession of the subject property surrendered the possession of the Sea Bonae to Universal. On January 22, 1986, Universal obtained a Final Summary Judgment of Foreclosure and obtained a foreclosure sale date which was scheduled to be held on February 12, 1986. However, prior to the foreclosure sale, the trustee requested authority to execute a quit claim deed of the Debtor's estate's interest in the Sea Bonae to Universal, which was granted with the proviso that the authorization to execute the quit claim deed shall be without prejudice to the Trustee to file the present adversary proceeding and to assert any claims the estate might have against Universal.

In due course the Trustee filed its adversary proceeding in which on October 28, 1986, the Trustee filed its original Motion for Summary Judgment. The Motion was heard in due course, and on October 27, 1986, this Court denied the Trustee's motion without prejudice. However, having considered the matter, it appeared to the satisfaction of the Court that there are several purely legal issues which could be resolved as a matter of law without resorting to a final evidentiary hearing, which would facilitate and expedite the resolution of the controversy between the parties. Thus, it was agreed that the issues which shall be resolved by an additional motion for summary judgment, that is the very motion presently under consideration, are the following:

(1) Whether the funds transferred from Berkley to UBM constituted property of the estate under Bankruptcy Code § 541 on February 25, 1985, the date the Petition for Relief was filed;

(2) Whether the transfer of funds sought to be avoided by Berkley under Bankruptcy Code § 549 was a pre- or post-petition transfer;

(3) Whether the transfer of funds from Berkley to UBM is deemed to be post-petition transfer of property of the estate and whether such transfer was authorized by the Court by its Debtor-in-Possession order and made in the ordinary course of business of Berkley.

The Trustee is attempting to reacquire these funds on behalf of the Debtor's estate and asserts that the Debtor's transfer into the escrow account constituted a post-petition transfer pursuant to Bankruptcy Code § 549. Universal, on the other hand, maintains that the Debtor's pre-petition deposit of funds into an escrow account constitutes a pre-petition transfer of property which would prevent the Trustee from reacquiring these funds on behalf of the estate.

█ Of course, the initial inquiry must be addressed to the threshold issue, which is whether or not the funds deposited in escrow by the debtor were properties of the estate on the date of the commencement of the case. This is so because if they were not, the contention of the postpetition transfer condemned by § 549(a)(1) of the Bankruptcy Code is without merit. Section 541 of the Bankruptcy Code deals with this subject and provides that the Debtor's "estate is comprised of all the following property, wherever located ... all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).

This question, in turn, cannot be answered except by a determination of the time of the transfer of the funds involved in this controversy. The term "transfer" is defined broadly under the Bankruptcy Code by § 101(50), which provides as follows:

"transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

This definition is broad enough to include both the transfer that occurs when an escrow is created and the transfer that occurs when the condition of an escrow is met.

Under Florida law legal title to property placed in escrow remains with the grantor until the occurrence of the condition specified in the escrow agreement.

[A]fter the grantor has accepted part of the purchase price a deed delivered in escrow gives to the intended grantee an equitable interest in the land, subject to be defeated if he fails to comply with the conditions of the escrow, but to become a complete (equitable title) upon performance of the escrow conditions. Also, the [legal] title to the money deposited in escrow remains in the depositor....

*22 Fla.Jur.2d* § 7, at 223 (1980) (footnotes omitted); *See Peters v. Spielvogel*, 163 So.2d 59 (Fla. 3d DCA 1964); *Cradock v. Cooper*, 123 So.2d 256 (Fla. 2d DCA 1960).

The Trustee cites *In re Missionary Baptist Foundation of America, Inc.*, 792 F.2d 502 (5th Cir.1986) for the proposition that when the contingencies of the escrow were not fulfilled prior to the bankruptcy that the Trustee was entitled to the funds placed in escrow. The Fifth Circuit in *Missionary Baptist, supra,* held that:

Where the contingency of the escrow was not fulfilled prior to bankruptcy, the debtor holds an interest in the property.

*Missionary Baptist, supra,* 792 F.2d at 506 (*citing In re Flannery*, 51 B.R. 697, 700 (Bankr.S.D.Ohio 1985)). In opposing the proposition urged by the Trustee Universal cites the following cases as authority for the proposition that the relevant "transfer" occurs at the time of deposit into the escrow account and not at the time the funds are released from escrow and paid over to the seller. *In re Newcomb,*

744 F.2d 621 (8th Cir.1984); *In re Knox Creations, Inc.,* 656 F.2d 230 (6th Cir. 1981); *In re O.P.M. Leasing Services, Inc.,* 46 B.R. 661 (Bankr.S.D.N.Y.1985). This Court having considered the authorities cited both by the Trustee and counsel for Universal, is satisfied that the decision of the Fifth Circuit in *Missionary Baptist, supra,* is controlling and shall be followed for the following reasons:

First, at the time the Eleventh Judicial Circuit was created, the Eleventh Circuit promulgated the Rule to the effect that all decisions by the Fifth Circuit Court of Appeals shall be controlling authority in this circuit unless the Eleventh Circuit by an en banc decision overrules the same. *Bonner v. City of Prichard, Alabama,* 661 F.2d 1206 (11th Cir.1981) Second, this Court is satisfied that the rationale and the reasoning of the *Missionary Baptist* case is more persuasive. It is without any dispute that on the date of the commencement of this case the funds deposited in escrow initially with Suncoast Title and later on with Mr. Dale, were funds placed in escrow pending the closing, but due to Universal's inability to clear up a title problem, no closing ever occurred prior to the commencement of this case; that is, on February 25, 1985.

This being the case, there is hardly any doubt that the Debtor at that time had the right to elect not to proceed with the transaction and had a legal right to recover the funds placed in escrow and back out of the transaction. The fact that he did not is of no consequence and is without legal significance. It is clear that the inability of Universal to deliver a good title was an unfulfilled contingency prior to the commencement of this case. This contingency, which was not removed by Universal prior to the commencement of the case, left the transaction in an uncompleted stage, thus, under the holding of *Missionary Baptist, supra,* the funds in escrow remained properties of the estate and were properties of the estate at the time of the commencement of the case.

From all these it follows that the turnover of the funds by the escrow agent post-petition to Universal was a post-petition transfer condemned by § 549 of the Bankruptcy Code. Therefore, the Trustee is entitled to the relief it seeks and recover the funds unless the transfer was deemed to be an authorized post-petition transfer authorized by the standard Debtor-in-Possession order entered by this Court, and because the transfer was payment by this Debtor in the ordinary course of business as contended by Universal.

Considering superficially the nature of Berkley's business one might conclude that the purchase of the Sea Bonae was an ordinary, everyday business transaction and the transfer was a transfer of funds in the course of its ordinary business. However, this conclusion does not bear a close scrutiny. The business of Berkley was basically not to acquire properties for resale but to acquire and operate properties acquired by affiliates. Be that as it may, the expenditure of more than a quarter of a million dollars by the Debtor was not intended to be a type of transaction included in the authorization for a Chapter 11 Debtor to conduct its business during the pendency of the Chapter 11. Universal was certainly aware of the pendency of the Chapter 11 case, was put on notice of the scope and extent of the authority granted to Berkley, and had the duty to inquire as to its power to engage in commercial transactions and expend the funds which were involved in this transaction. For this reason this Court is satisfied this last contention of Universal is equally without merit.

Having concluded that the funds involved in this controversy were properties of the estate on the date of the commencement of the case; that the transfer of the funds occurred post-petition, and it was not an authorized transaction by this Court or made in the ordinary course of business, the Trustee is entitled to the relief it seeks. Having also concluded that there are no genuine issues of material fact, it is appropriate to enter a summary judgment in favor of the Trustee and against Universal, and the Motion for Summary Judgment filed by Universal shall be denied.

A separate final judgment will be entered in accordance with the foregoing.