**In re MARALAK, LTD., Debtor.**

**Bankruptcy No. 88–530–BKC–6P1.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Aug. 9, 1989.

Peter N. Hill, Orlando, Fla., for Amin Mitha.

Andrea Ruff, Orlando, Fla., Trustee.

Frank Jakes, Tampa, Fla., for Howard Johnson Co.

Mary Lau, Tampa, Fla., for Marriott Family Restaurants.

Frank M. Wolff, Maitland, Fla., for debtor.

## MEMORANDUM OPINION

GEORGE L. PROCTOR, Bankruptcy Judge.

This case came before the Court upon the trustee's motions to assume subleases of nonresidential property, to reject an executory contract and for authority to operate a business formerly operated by the pre-conversion debtor-in-possession.

Evidentiary hearings were held on May 22, 1989, and June 5, 1989. Upon the evidence presented and the argument of counsel, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### THE RESTAURANT SUBLEASES

This case was commenced by the filing of a voluntary petition under 11 U.S.C. § 301 *et seq.* on March 14, 1988, by Maralak, Ltd. ("Maralak"). Maralak is a limited partnership which, prior to the conversion of this case, operated several motor lodge and restaurant facilities in Florida, typically through long-term lease and sublease arrangements.

At the time of the filing of the petition, Maralak had been subleasing four restaurant properties from Marriott Family Restaurants, Inc., ("Marriott Restaurants") since 1984. The properties were in Lakeland, Cocoa, Clermont, and Marathon, Florida.

On May 12, 1988, the Court granted an extension of time until July 13, 1988, for Maralak to assume or reject executory leases and subleases of nonresidential real property pursuant to 11 U.S.C. § 365(d)(4). On July 7, 1988, Maralak filed motions to assume every nonresidential lease or sub-

lease of real property in which it had an interest.

At a hearing on August 16, 1988, Maralak withdrew its motion to assume the Clermont Restaurant Sublease and surrendered possession to Marriott Restaurants. From that point on, both parties treated the sublease as rejected.

On October 12, 1988, an order was entered approving Maralak and Marriott Restaurants' stipulation for the withdrawal of Maralak's assumption of the Cocoa Restaurant Sublease.

On December 21, 1988, the court authorized Marriott Restaurants to recover possession of the Lakeland and Marathon Restaurant Subleases pursuant to a stipulation of the parties.

This case was converted to Chapter 7 on January 31, 1989, and Andrea Ruff was appointed trustee. After conversion, the Court granted the trustee's request to extend the time in which the trustee could assume or reject executory contracts to April 26, 1989.

On April 26, 1989, the trustee moved for a second extension of time in which to assume the four restaurant subleases in question.

At all times since the conversion, the Lakeland, Marathon and Clermont restaurants have been closed and not operated by Marriott Restaurants or any other party. The Cocoa restaurant was surrendered prior to conversion of the case by reason of the July 31, 1988, lease expiration date.

Since August 1, 1988, Marriott Restaurants has expended in excess of $150,000.00 on the four restaurants in performance of Maralak's rent, tax, and maintenance obligations. The trustee identified no prospective buyer or contract to purchase the subleases in question. The trustee did not present any evidence as to her ability to make rental payments under any of the restaurant subleases or otherwise perform the obligations required by them.

## THE LAKELAND MOTOR LODGE CONTRACT

While this case remained in Chapter 11, Maralak, operating as debtor in possession, entered into a written contract with Amin Mitha for the sale and purchase of the Lakeland motor lodge operation. Mitha later assigned his rights in the contract to Farna, Inc., a newly formed corporation.

The assets to be transferred consisted of furnishings, fixtures and equipment, as well as Maralak's rights, as sublessee, under a sublease of the real property from the Howard Johnson Company ("Howard Johnson"). As debtor-in-possession, Maralak prepared a Report and Notice of Debtor–in–Possession's Intention to Sell Property of the Estate and circulated it to all creditors and interested parties. Maralak also moved for authority to assume the sublease from Howard Johnson and to assign it to the purchaser.

Two parties objected to the proposed sale. Marriott Restaurants withdrew its objection prior to hearing. Howard Johnson objected to the sale, in part because a large portion of the purchase price would be paid to Marriott Restaurants and not directly to the estate. On November 8, 1988, the Court held a hearing on the objection, and received evidence and heard argument. The Court solicited higher bids for the property from those present in open court. Hearing none, the Court overruled the objection and entered a written order.

Howard Johnson also opposed Maralak's motion to assume and assign the sublease. The Court similarly overruled the objections and entered an order authorizing the assumption and assignment, subject to payment of $36,552.88 within five days to Howard Johnson for the purpose of curing rent arrearage under the sublease.

The purchase price for the motor lodge operation was $350,000.00. The purchaser deposited $10,000.00 with David Evans, an attorney hired by the debtor, who later agreed to act as escrow agent under a written escrow agreement. At closing, the purchaser was required to pay an additional $65,000.00. The balance of the purchase price was to consist of a promissory note for $50,000.00 payable to Maralak and a note for $225,000.00 in favor of Marriott Restaurants. Both notes were to be se-

cured by the furnishings, fixtures and equipment of the Lakeland motor lodge, although the evidence was not clear as to the intended priorities. The evidence did establish that the value of the collateral standing alone was substantially less than the total of the two notes.

On December 7, 1988, the parties convened at the office of David Evans and consummated a "dry closing," in effect closing in escrow. Closing documents were signed, including notes, bill of sale, closing statement, assignment of sublease, and the balance of the cash portion of the purchase price was paid over to the escrow agent.

The testimony shows two reasons why a full closing did not take place on December 7. First, the purchaser's attorney, Stephen Baker, was unable to attend the closing. Second, the Court had not yet signed an order authorizing assumption and assignment of the sublease. The escrow agreement rendered the purchaser's obligations under the contract specifically subject to Baker's review and approval of the closing documents.

On December 8, 1988, Baker wrote to Evans, advising him that the purchaser would not go forward. On December 12, however, Baker again delivered a letter to Evans authorizing the transaction to proceed under certain conditions. On the same day, the parties issued written directions to the escrow agent, authorizing him to disburse funds. Evans promptly paid $36,552.88 to Howard Johnson, as required by the order authorizing assumption and assignment of the sublease. He later made the following disbursements, with the consent of both parties: $4,407.77 to Lakeland Associates for rent, $1,209.36 to GTE for telephone service prior to closing, and $3,200.00 as rent on a separate property of the debtor in which the purchaser had no interest. The balance of the funds were held by the escrow agent pending an agreement for proration of tangible personal property taxes. Evans continues to hold in excess of $32,000.00 in an interest bearing account.

The purchaser took possession of the property on December 13, 1988. All rent payments are current, as are all payments to Marriott Restaurants under the $225,-000.00 note. The first monthly payment under the $50,000.00 note in favor of the debtor was sent to Maralak in a timely fashion prior to conversion of the case. Subsequent payments were sent to the trustee but were rejected. In addition, the buyer has made capital improvements to the property in excess of $70,000.00.

On April 26, 1989, the trustee moved for an extension of time in which to assume or reject an executory contract regarding the sale of the motor lodge operation in Lakeland.

## CONCLUSIONS OF LAW

### THE RESTAURANT SUBLEASES

Section 365 of the Bankruptcy Code addresses the requirements and procedures for, and consequences of, assumption or rejection of nonresidential leases by either a Chapter 11 debtor in possession or a Chapter 7 trustee. With regard to the motions before the Court, the pertinent sections are as follows:

*Section 365(b)(1)* If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract of lease.

*Section 365(d)(3)* The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease

of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

*Section 365(d)(4)* Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

Section 365(d)(4) contemplates that a Chapter 11 debtor in possession must timely and affirmatively assume a commercial lease where it is the lessee and that failure to do so can result in a rejection of the lease. As the official comments to Section 365 recognize, the time limits are designed to protect lessors from indefinitely being left in doubt as to the debtor's intentions and the future of the lease. *See also, In re Dieckhaus Stationers of King of Prussia, Inc.,* 73 B.R. 969, 971–973 (Bankr.E.D.Pa. 1987).

The protection afforded lessors by Section 365(d)(4) are particularly significant in this case. Marriott Restaurants, as sublessor, has not only lost rental income during the period that these subleases have been subject to bankruptcy jurisdiction but has been required to pay rent and perform other leasehold obligations to its landlords under the main leases. Section 365(d)(4) was designed to provide a definite period of time within which any uncertainty as to the continuing interest of the debtor in leased property would be resolved with finality. *In re Haute Cuisine, Inc.,* 57 B.R. 200 (Bankr.M.D.Fla.1986).

The statutory framework of Section 365(d)(4) as applied in this case is uncomplicated. Maralak, as debtor-in-possession, had until July 13, 1988, to decide whether to assume or reject the Restaurant subleases. Maralak expressed a timely decision to assume all four Restaurant Subleases.

Thereafter, Maralak withdrew its motions as to each of the subleases, effectively rejecting them.

■ Stipulations between a Chapter 11 debtor in possession and a nondebtor party presented to the court during Chapter 11 proceedings are valid, enforceable obligations. As the court stated in *In re Sullivan Machinery Co.,* 79 B.R. 523 (Bankr. Conn.1987):

Although it is widely held that a bankruptcy court has broad equitable powers which may be involved so that substance will not give way to form [and] technical considerations will not prevent substantial justice from being done ... judicial disregard for a stipulation bargained for by the parties and recited in open court hardly fits within that concept....

Thus, to the extent that the various stipulations between Maralak and Marriott Restaurants were designed to effect rejections of the Restaurant Subleases, those stipulations will be given full effect.

■ The conversion of a case from Chapter 11 to Chapter 7 does not erase the prior proceedings. Court orders lifting the stay, court approved stipulations, rejections of executory contracts and other such matters pertinent to the progress of a Chapter 11 case are not wiped out with an order of conversion. In holding that a conversion order does not re-establish the automatic stay previously lifted by a court order during the Chapter 11 proceedings, the Eleventh Circuit recently stated "[T]he conversion does not undo everything that happened before." *In re State Airlines, Inc.,* 873 F.2d 264, 268, n. 10 (11th Cir.1989). Similarly commercial leases rejected during a Chapter 11 case are not revived by the conversion order, triggering a new opportunity for assumption or rejection by the trustee. A commercial lease rejection during Chapter 11 proceedings whether by stipulation, court order, or operation of law remains rejected and cannot be assumed by the Chapter 7 trustee after conversion. *See, In re Haute Cuisine, Inc., supra,* at 203 .(Once lease deemed rejected, 365(d)(4) does not allow extension of time to permit assumption).

## THE LAKELAND MOTOR LODGE CONTRACT

Section 365 of the Bankruptcy Code provides that the trustee may, with the court's approval, assume or reject an executory contract of the debtor. 11 U.S.C. § 365(a). The term "executory contract" is not defined in the Code. This Court on prior occasions has adopted what has generally been referred to as the "Countryman" definition of executory contract: "An executory contract is 'a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'" *See, e.g., In re Charter Company,* 52 B.R. 267 (Bankr.M.D.Fla.1985), *citing* Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 460 (1973) and *In re J.M. Fields, Inc.,* 22 B.R. 861 (S.D.N.Y.1982).

Application of the Countryman definition of executory contracts to Section 365 is supported by the legislative history of the Code. "Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides." S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5844, 6303.

The Court does not find any unperformed obligations on the part of either party to the purchase and sale transaction. At best, the parties may have been required at some point to agree on distribution of the remaining escrowed funds. The signed closing statement and directions to escrow agent should have provided him with sufficient authority for disbursement of all funds held by him as early as December 12, 1988. Moreover, even if a further agreement of the parties was necessary, paragraph 5 of the escrow agreement provided for resolution of disputes over entitlement to escrowed funds by way of an interpleader action in the Circuit Court of Orange County, Florida. Clearly, the debtor in that situation would have had no legal justification for declaring a material breach resulting in rescission of the sale. While the trustee is authorized by Section 365, with the court's approval, to reject or breach an executory contract of the debtor, with the resulting damage claim against the estate, the trustee otherwise acquires no contract remedies unavailable to the debtor in the superseded Chapter 11 case.

While it is true that the purchaser was required to pay a portion of the purchase price to the debtor over a protracted period of time under the terms of the $50,000.00 promissory note, "[a] note is not usually an executory contract if the only performance that remains is repayment." *Pennsylvania Tire Company v. Firestone (In the matter of Pennsylvania Tire Company),* 26 B.R. 663, 674 (Bankr.N.D.Ohio 1982), *citing* House Report No. 95–595, 95th Congress, 1st Sess. (1977) 347, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6303–04; *Air Vermont, Inc. v. Cutillo (In re Air Vermont),* 47 B.R. 540 (Bankr.D.Vt.1985).

In *Carlson v. Farmers Home Administration (In the matter of Newcomb),* 744 F.2d 621 (8th Cir.1984), the United States obtained a judgment against Newcomb. The parties negotiated a stay of execution pending appeal, with Newcomb delivering funds sufficient to satisfy the judgment to an escrow agent. The escrow agent was to deliver the funds to the United States if the judgment was affirmed or refund the money to Newcomb in the event of a reversal. The judgment was affirmed. Before the funds could be delivered to the United States, Newcomb filed a bankruptcy petition. The trustee filed a complaint for turnover, based in part on the theory that the escrow agreement could be rejected as an executory contract under § 365 of the Code. The court held, however, that

> [A]n escrow is something more than a contract—it is a method of conveying property ... [w]hen property is delivered in escrow the depositor loses control over it and an interest in the property passes to the ultimate grantee under the escrow agreement.

Id. at 624.

The court found that all that remained to be done at the time of the bankruptcy

petition was for the escrow agent to turn the funds over to the United States and that, accordingly, there was no executory contract.

In the case of *Gassen v. Universal Building Materials, Inc. (In the matter of Berkley Multi–Units, Inc.)*, 69 B.R. 638 (Bankr.M.D.Fla.1987), the debtor entered into a contract for the purchase of an apartment building. A closing was held in escrow. When the parties convened for a final closing, they learned of title problems which prevented the seller from conveying clear title to the debtor. Nevertheless, the debtor assumed possession and control of the property and operation of the facility. Shortly thereafter, the debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code.

The issue, as framed by the Court, was whether the escrowed funds constituted property of the estate on the date of the filing of the petition such that the subsequent transfer by the escrow agent to the seller constituted a postpetition transfer avoidable by the trustee under section 549 of the Code. The Court held that under Florida law legal title to property placed in escrow remains with the grantor until the occurrence of the condition specified in the escrow agreement. Although the seller cited *Newcomb*, supra, for the proposition that the transfer occurs at the time of the deposit into the escrow account, and not at the time the funds are released from escrow and paid over to the seller, the Court followed the Fifth Circuit decision in *In re Missionary Baptist Foundation of America, Inc.*, 792 F.2d 502 (5th Cir.1986), which held that where contingencies of an escrow are not fulfilled prior to bankruptcy, the trustee holds an interest in the property.

Instrumental in the Court's decision in *Berkley* was the fact that, because of the seller's inability to clear up a title problem, a closing never occurred prior to petitioning for bankruptcy. The debtor clearly had the right to elect not to proceed with the transaction and to recover the funds placed in escrow. The Court concluded, therefore, that the debtor had an interest in the funds on the date of the petition and that the

subsequent transfer of the funds by the escrow agent to the seller constituted an avoidable postpetition transfer of property of the estate.

■ In the present case, all relevant events occurred during the pendency of the Chapter 11 case. The debtor fully complied with the requirements imposed by § 363 of the Bankruptcy Code and Bankruptcy Rule 6004 governing sales of property of the estate outside the ordinary course of business and with § 365 of the Code and Rule 6006 in connection with assumption and assignment of executory contracts and unexpired leases. Although there was a transfer of property of the estate, it was authorized by the Court and was for a valuable consideration. The thinking of the market place was reflected when no one offered more for the property, although there were ample opportunities to do so. For these reasons, the Court need not reach the issue raised by the trustee as to the value of the property.

Further distinguishing this case from *Berkley* is the fact that there was an escrow closing on December 7, 1988, and a final closing on December 12th. In *Berkley*, on the other hand, the transaction was never closed with finality. Lastly, the funds remaining in escrow upon the conversion of the case to Chapter 7 and appointment of the trustee were undisputedly payable to the debtor pursuant to the executed closing agreement and directions to the escrow agent. The escrow agent was continuing to hold funds on the date of conversion with the approval and acquiescence of both the buyer and the seller.

Accordingly, the Court finds the *Newcomb* case persuasive and holds that the existence of escrowed funds on the date of conversion to Chapter 7 does not render executory the contract for purchase and sale where, as here, possession had been transferred, $45,000.00 of the purchaser's funds had been disbursed, and the purchaser has continued to pay rent, service its obligations under promissory notes executed at the closing, and fund substantial capital improvements, all in reliance upon the fact of the closing.

## CONCLUSION

For the foregoing reasons the Court will enter a separate order denying the trustee's motion seeking additional time to assume or reject the Restaurant Subleases, motion to reject executory contract, and the emergency motion for authority to operate the Lakeland Motel.