In re SANDMAN ASSOCIATES, L.L.C., Debtor.

James E. Dye, Appellant,

v.

Sandman Associates, L.L.C., et al., Appellees.

James E. Dye, Appellant,

v.

Sandman Associates, L.L.C., Appellee.

Nos. 1:99CV00186, 1:00CV00023.

United States District Court, W.D. Virginia, Abingdon Division.

Aug. 9, 2000.

James E. Dye, Green & Hale, Bristol, TN, for Appellant.

Howard J. Beck, Jr., Gentry, Locke, Rakes & Moore, Roanoke, VA, for Appellee.

## OPINION

JONES, District Judge.

In these consolidated bankruptcy appeals, the principal question presented is whether the debtor, a limited liability company, properly rejected a contract by which it granted a membership interest in return for an injection of capital. Finding that the contract was not executory, and thus not subject to rejection, I reverse the bankruptcy court.

## I

The debtor in possession and appellee, Sandman Associates, L.L.C. ("Sandman"), is a Virginia limited liability company.[1] It was formed in April of 1995 for the purpose of constructing and managing certain commercial real estate, known as the Preston Square Office Building, located in Bristol, Virginia. In October of 1995 the appellant, James E. Dye ("Dye"), agreed to pledge to a bank a certificate of deposit owned by him to secure the bank's letter of credit issued to Sandman.[2]

In July of 1996, Dye was again asked to financially assist the project. He met with Jerome P. Malinay ("Malinay") and William T. Desmone ("Desmone"), the managing members of Sandman, and was told that the project was in crisis and that unless $350,000 could be obtained by the

next day, subcontractors would file liens. After a meeting of the members of Sandman,[3] it was proposed that if Dye would contribute his prior certificate of deposit along with an additional cash payment of $150,000, for a total of $350,000, he would receive a twenty-five percent interest in Sandman and a priority over other members in distributions until his total contribution had been repaid.

■ Following lengthy discussions,[4] the parties finally agreed, and in accord with the agreement, the following letter was faxed to Dye on July 18, 1996:

SANDMAN ASSOCIATES, LLC
Wallace Pike
Bristol, VA 24202

July 18, 1996

Mr. James R. Dye
Jefferson City, TN

Re: Preston Square Office Building
2426 Lee Highway
Bristol, VA 24202 (The "Project")

Dear Mr. Dye:

You have agreed to advance the amount of $350,000.00 to be used to pay subcontractors and materialmen for the Project, which amount represents specific construction cost overruns of Barker Construction Corp., general contractor on the Project responsible for said payments. In consideration of the payment by you of that amount, Sandman Associates, LLC, including its member, Jack

---

1. The facts in the case are derived from the evidence presented at two hearings held by the bankruptcy court, including the parties' written stipulation of certain facts and documents. The parties agree that there are no disputed issues of historical fact.

2. The record does not disclose what consideration Dye received for this pledge, other than that the individual members personally guaranteed to repay Dye in case his collateral was foreclosed upon by the bank. Apparently, Dye was a friend of Jack M. Barker ("Bark-

er"), one of the members of Sandman and also a principal in Barker Construction Corporation, the building contractor for the project, and it is possible that the pledge was made as an accommodation to Barker.

3. Besides Malinay, Desmone, and Barker, the other members of Sandman were N. Stuart Wright, III, and N. Stuart Wright, IV.

4. Desmone testified below that "[w]e haggled for three days." (Tr., Oct. 26, 1999, at 38.)

Barker, grants the following, effective as of August 1, 1996:

1. A twenty-five percent (25%) membership in Sandman Associates, LLC shall be granted to James R. Dye, subject to the terms and conditions of the Membership Agreement, which will be executed by you as a new member.

2. The commitment of Sandman Associates, LLC to return the aforesaid capital account, either in the form of excess cash flow or proceeds of divestiture, prior to the distribution to any member of profit, gain, fees, salaries or ordinary income of any type. It is understood that Sandman Associates, LLC will pay operating expenses, debt service, and retain operating reserves for the safe operation of Preston Square Office Building and will be subject to the terms and conditions of the loan secured by the building.

3. Sandman Associates, LLC and its members understand that you will not, due to the effective date of your membership, personally guarantee the presently committed loan to be funded by Highlands Union Bank in the amount of $1,800,000.00, to be secured by the real property of Sandman Associates, LLC as described above as the Project.

This letter constitutes the commitment of Sandman Associates, LLC and will be memorialized on the effective date by appropriate corporate minutes. Sincerely yours,
SANDMAN ASSOCIATES, LLC
s/ William T. Desmone
Managing Member
(Hr'g, Oct. 13, 1999, Ex. 2.)[5]

On the next day, July 19, Dye delivered a cashier's check for $150,000 to Malinay and Desmone. Along with the proceeds from the letter of credit representing Dye's $200,000 certificate of deposit, the funds were deposited in Sandman's account and used to pay construction bills on the project.

In accord with the agreement, all of the existing members of Sandman executed a written consent effective August 1, 1996, that reallocated the membership interests in Sandman to reflect Dye's twenty-five percent interest and memorialized the preference to him in repayment of his $350,000 capital contribution. However, in November of 1996, Dye was sent an identical written consent signed by only Malinay and Desmone, but which had an effective date of September 1, 1996, instead of August 1, 1996. The second page of the document contained wording to be signed by Dye consenting to the terms of the operating agreement of Sandman and acknowledging that his membership was effective as of September 1, 1996.

Thereafter, Dye's attorney, Don Cooper, sought additional information. By letter of December 12, 1996, Malinay sent Cooper copies of certain of Sandman's legal and financial documents. In the letter, Malinay asked Cooper and Dye to acknowledge that the information was confidential and would not be disclosed to third parties. He also recited that while Dye's payment of capital contribution "consummated his membership in the L.L.C..... [o]ther procedural requirements with regard to the membership interest were the execution by Mr. Dye of the existing operating agreement, which has not been done, and the execution by all members of the minutes reflecting the change in the ownership interest in Sandman, which were executed as of August 1, 1996." (Stip. of Facts, Ex. F of Ex. 4.)

The letter to Cooper also explained that in order to make sure that Dye was not

---

**5.** The letter referred to the "Membership Agreement" but the parties are agreed that this was a misnomer for the operating agreement. Pursuant to state law, the members of a limited liability company may enter into an operating agreement "to regulate or establish the affairs of the ... company, the conduct of its business and the relations of its members." Va.Code Ann. § 13.1–1023, subd. A, par. 1. (Michie 1999).

personally liable for any guaranty on an additional line of credit obtained by Sandman, the members had agreed to make the effective date of Dye's membership September 1, 1996, instead of August 1. Desmone said that Dye had the task of obtaining the execution of the "minutes" making that change.

On February 24, 1997, Cooper wrote Malinay, stating that "[a]t this point" Dye was not a member of Sandman and that while he might "accept" a membership, he would not make such an election until "we can determine what the actual obligations of Sandman Associates are and have been satisfied that Mr. Dye's interests are protected." (Hr'g, Oct. 13, 1999, Ex. 6.) Malinay responded by letter of February 27, 1997, stating in part as follows:

> Sandman was perplexed by the nature of your letter. Sandman has considered James Dye a member since last summer. The corporate records in the form of minutes executed by all members reflect Mr. Dye as a member; and Mr. Dye has never represented himself to Sandman as anything other than a member. As you will recall from the previous correspondence of December 12, 1996, Sandman outlined the sequence of events that perfected Mr. Dye's membership interest. Sandman stands prepared, as it did in December, to provide any requested financial information once Mr. Dye acknowledges the Operating Agreement, which was a procedural requirement with regard to the membership interest. In lieu of this execution, for now, a signed agreement from Mr. Dye and you agreeing that the financial information to be provided is proprietary, confidential, and will not be disclosed in any way to any other person or entity without the prior written consent

of Sandman Associates, L.L.C. will be acceptable.

(Hr'g, Oct. 13, 1999, Ex. 7.)

The record is silent thereafter until nearly a year later, when Cooper responded by letter dated December 9, 1997. In it he stated that "[y]ou may consider my letter, and you may consider Mr. Dye's counter-signature on this letter, as our acknowledgment of the confidential and proprietary nature of that information." (Hr'g, Oct. 13, 1999, Ex. 4.) He said that Dye was willing to consider the delayed entry date of September 1, subject to a review of the balance sheets of the company to insure that there had been no material adverse change between August 1 and September 1, 1996. In addition, Cooper noted that Dye had furnished him a copy of Sandman's operating agreement, and stated, "I would merely like to confirm that the instrument which will govern Mr. Dye's interest in this limited liability company will be as set forth in the operating agreement ... [and][t]he only additional amendment to that paperwork would be the instrument signed by you as of September 1, 1996 with the possibility that the document would more properly be dated August 1, 1996 as earlier agreed." (*Id.*) Dye also signed the letter from Cooper under the typed words, "I join in the above for the purposes stated therein." (*Id.*)

■ In spite of the conciliatory tone of this letter, the relationship between the parties thereafter became strained. While Dye had once expressed the view (through his lawyer) that he would prefer to be a creditor of Sandman rather than a member, he then indicated he not only desired to be a member, but the controlling member. Since the operating agreement defined voting interest in terms of capital contribution,[6] and since the members other than Dye had made only nominal cash capital contributions,[7] Dye asserted that he

---

**6.** Operating Agreement § 1.01(i). (Stip. of Facts, Ex. 5.) The Virginia Limited Liability Company Act recites that unless provided in the operating agreement or otherwise, the members shall vote in proportion to their contributions. *See* Va.Code Ann. § 13.1–1022, subd. B. (Michie 1999).

**7.** The other members' cash capital contributions ranged from $50 to $350, although they

had effective control of Sandman. The other members naturally enough disputed Dye's position.[8] Dye also submitted proposed amendments to the operating agreement, the nature of which are not disclosed in the record, but which were not acceptable to the other members.

Sandman was scheduled to close a refinancing of its bank loan on April 8 and 9, 1998. On April 2, Dye filed suit in a Virginia state court against Sandman and its other members, alleging that Malinay and Desmone had attempted to "eject" him from his membership in Sandman, and seeking an accounting, injunctive relief and damages. As a result of that suit, the refinancing commitment was withdrawn.

The defendants did not respond to the state court suit, and Dye filed a motion for entry of a decree pro confesso. At a hearing on this motion, Sandman's counsel advised the state court that Sandman was about to file a petition in the bankruptcy court. The state court accordingly took no action and on June 3, 1998, Sandman filed in this district a voluntary petition pursuant to Chapter 11 of the Bankruptcy Code.

At the date of filing, Sandman's assets were valued at $3,202,864.30, its secured debt was $2,044,323.05, and its unsecured debt was listed at $102,386.30. It was one payment in arrears with regard to its secured debt, which it cured post petition. Since the date of filing, Sandman has continued to pay all secured debt, and has increased its cash reserves.[9]

The purpose of the bankruptcy petition was to deal with Dye. Shortly after filing the petition for relief in the bankruptcy court, Sandman filed a motion asking the court to either determine that the July 1996 agreement with Dye was not binding, or, in the alternative, approve Sandman's rejection of the agreement as an executory contract. The basis for the motion was that Dye had not executed the operating agreement as required or "acknowledged, accepted, or otherwise become a party [thereto]." (Stip. of Facts, Ex. 6.) That motion was withdrawn by Sandman, and later refiled solely as a motion to reject the contract.

There was considerable procedural sparing in the litigation. Dye's counsel tried to persuade the state court to adjudicate the ownership dispute on the ground that proceeding in that way would not violate the Bankruptcy Code's automatic stay. Sandman filed a motion in the bankruptcy court to enjoin further proceedings in the state court, but the bankruptcy court (Pearson, J.) denied that motion, on the condition that Dye dismiss Sandman as a party to the state court action and that "no judgment shall be rendered directly affecting any financial interest of the Debtor herein, which thereby permits the state court to resolve all interests and issues between the members as may be necessary and appropriate." (Stip. of Facts, Ex. 20.)

Sandman noted an appeal from Judge Pearson's order, but later voluntarily dismissed its appeal.[10]

In the meantime, Sandman's counsel, Gentry Locke Rakes & Moore, filed first and second applications in the bankruptcy court for compensation and reimbursement of expenses. Dye objected to these applications on the ground that a substantial portion of the law firm's time for which it

---

apparently take the position that they have made other capital contributions, such as guaranties, that exceed Dye's cash contribution.

**8.** Of course, Dye's change of heart in being a member may have had to do with the reversal of fortunes of Sandman. After the early financial difficulties, the project appears to have become successful.

**9.** It has not paid its unsecured debt. Of the unsecured debt totaling $102,386.30, the amount of $86,000 is owed to entities in which either Malinay or Desmone were principals. The sum of $10,000 is owed to Desmone's wife for legal services.

**10.** Nevertheless, counsel advises that the state court has yet to decide the action brought by Dye.

sought payment involved the dispute over Dye's membership in Sandman, which Dye characterized as representation of the other members and not in the interests of Sandman itself. The bankruptcy court (Krumm, J.) held a hearing on these applications on October 13, 1999, and at the conclusion of the hearing, overruled Dye's objections on the ground "that the effort of the debtor . . . to get a determination as to the nature and extent of Mr. Dye's interests is an effort by the debtor to determine its ability to reorganize," and thus compensable. (Tr., Oct. 13, 1999, at 153.) Dye noted an appeal from this decision, which is one of the two consolidated appeals now before me.[11]

On October 26, 1999, the bankruptcy court (Krumm, J.) held a hearing on the motion to reject the Dye contract. By agreement, the court also considered the evidence previously presented in connection with the fee applications, including the joint stipulation of facts. At the conclusion of the hearing, the court granted the motion to reject the contract, holding that (1) the contract was between Dye and Sandman, and not between Dye and the other members; (2) the contract was executory, in that material performance was due on both sides, and in particular, as to Dye, his failure to execute the operating agreement meant that the contract was executory; (3) Sandman's decision to reject the contract was protected by the business judgment rule; and (4) the prior decision of Judge Pearson declining to enjoin the state court proceeding did not constitute an abstention by the bankruptcy court on the issue of rejection of the Dye contract. (Tr., Oct. 26, 1999, at 107–17.) In addition, earlier in

the hearing, the bankruptcy judge overruled Dye's contention that there had been insufficient notice of the hearing on the motion to reject. (*Id.* at 11.)

Formal orders incorporating these decisions were entered on December 3, 1999, and Dye noted his appeal from these orders. This appeal was consolidated with his appeal from the earlier orders approving the fee applications.

 The parties have briefed the issues and presented oral argument and the appeals are now ripe for decision.[12]

**II**

The primary issue before me is whether the bankruptcy court erred in approving the rejection of the contract granting Dye his membership in Sandman. Resolution of that question requires exploration of "one of the most difficult areas of bankruptcy law"[13]—the rejection of executory contracts permitted by section 365 of the Bankruptcy Code.

 Section 365(a) provides that a bankruptcy trustee or debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C.A. § 365(a) (West 1993). In Chapter 11 proceedings, this decision may be made at any time before the confirmation of the plan of reorganization. *See* 11 U.S.C.A. § 365(d)(2) (West 1993). If the contract is rejected, any claim for damages as a result of the rejection becomes an unsecured claim against the debtor. *See Stewart Foods, Inc. v. Broecker (In re*

---

**11.** In the first interim application, counsel for Sandman was awarded a fee of $21,093.50 and reimbursement of expenses of $1,029.81, and in the second interim application, counsel was awarded a fee of $16,299 and expenses of $363.22.

**12.** This court has jurisdiction pursuant to 28 U.S.C.A. § 158(a) (West Supp.2000). An interim fee award is normally not appealable as a final order, *see Spencer, Spencer, Depper &*

*Guthrie v. Paskay (In re Hillsborough Holdings Corp.),* 164 B.R. 673, 674 (M.D.Fla.1994), but in this case, where the appeal may materially advance the litigation, I will grant an interlocutory appeal. *See* 28 U.S.C.A. 158(a)(3) (West Supp.2000); Fed. R. Bankr.P. 8003(c).

**13.** Michael T. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook,* 62 U. Colo. L.Rev. 1, 1 (1991).

*Stewart Foods, Inc.),* 64 F.3d 141, 144 (4th Cir.1995).

■ The authority granted by section 365 allows the trustee or debtor in possession to pick and choose among contracts, assuming those that are favorable, and rejecting those that are not. As in the present case, many debtors seek the protection of the bankruptcy courts solely to shed unwanted contracts under section 365.[14]

One problem is that the Bankruptcy Code does not define "executory contract," and that term has predictably been the subject of much scholarly and judicial disagreement. *See, e.g.,* Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts,* 74 Minn. L.Rev. 227 (1989). Fortunately for my purposes here, the Fourth Circuit has staked out its position in the leading cases of *Gloria Manufacturing Corp. v. International Ladies' Garment Workers' Union,* 734 F.2d 1020 (4th Cir.1984), and *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043 (4th Cir.1985).

■ In *Gloria,* the court held that a collective bargaining agreement, while potentially executory, was not subject to rejection because it had terminated under its own terms. In the process of its analysis, the court defined an executory contract as one " 'under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other.' " 734 F.2d at 1022 (quoting Vern Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L.Rev. 439, 460 (1973)).

In *Lubrizol,* the Fourth Circuit held that a technology licensor that had filed for Chapter 11 relief could reject the license, forcing the licensee to give up its right to the technology. The court reaffirmed its earlier definition of an executory contract and held that whether a contract is executory is an issue of law "that may be freely reviewed by successive courts." 756 F.2d at 1045.[15]

■ Assuming that the contract at issue is executory, the bankruptcy court must then determine whether it is properly rejected, that is, whether its rejection would be advantageous to the debtor. *See Lubrizol Enterprises, Inc.,* 756 F.2d at 1046. The Fourth Circuit has adopted the "sound business judgment rule" by which the same deference is given to a decision to reject a contract as is given to other business management actions or decisions. *See id.* at 1046–47. Conversely, if the decision to reject is "manifestly unreasonable," it should not be approved. *See id.* at 1047.

■ In determining whether the decision to reject was based on sound business judgment, the bankruptcy court acts in its fact-finding role, and its decision is review-

14. For example, the actress Tia Carrere sought bankruptcy in order to reject a contract requiring her to act in one television show so that she could appear in another. *See In re Carrere,* 64 B.R. 156, 157 (Bankr. C.D.Cal.1986), *cited in* Jesse M. Fried, *Executory Contracts and Performance Decisions,* 46 Duke L.J. 517, 520 (1996).

15. The specific holdings of both *Gloria* and *Lubrizol* have been later addressed by legislation. Since *Gloria* was decided, rejections of collective bargaining agreements are governed by Bankruptcy Code §§ 1113 and 1114. Section 1113 was adopted in the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, title III, § 541(a),

98 Stat. 333, 390 (1984), 11 U.S.C.A. § 1113 (West 1993). Section 1114 was enacted in the Retiree Benefits Bankruptcy Protection Act of 1988, Pub.L. No. 100–334, § 2, 102 Stat. 610 (1988), 11 U.S.C.A. § 1114 (West 1993). In response to *Lubrizol,* Congress amended § 365 to overrule the specific result of the case by providing that rejection of a technology license does not cancel the license. *See* Intellectual Property Protection Act of 1988, Pub.L. No. 100–506, § 1, 102 Stat. 2538, 2538 (1988), 11 U.S.C.A. § 365(n) (West 1993 & Supp.2000). The general definition of an executory contract as set forth in *Gloria* and *Lubrizol* is still binding precedent in this circuit, however.

able under the clearly erroneous standard, rather than de novo. *See id.*[16]

## III

■ The bankruptcy court accepted Sandman's argument that the July 18, 1996, contract was executory as to Dye because Dye never executed the operating agreement as set forth in the contract. Because I find that Dye's failure to execute the operating agreement was not a material breach of the contract, I reverse the bankruptcy court's decision.[17]

■ Not every failure to perform a contractual obligation is a material breach that excuses performance by the non-breaching party. Rather, "the act failed to be performed must go to the root of the contract." *Neely v. White,* 177 Va. 358, 14 S.E.2d 337, 341 (1941).[18] "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Horton v. Horton,* 254 Va. 111, 487 S.E.2d 200, 204 (1997). Viewing the principle another way, a breach of a contract cannot be material if the breaching party has rendered substantial performance, which is performance not in every detail, but in all essential parts. *See* 15 Richard A. Lord, *Williston on Contracts* § 44.54 (4th ed.2000).

■ The contract of July 18, 1996, provided that "[i]n consideration of the payment by [Dye] of [$350,000]" Sandman promised to (1) grant Dye a twenty-five percent interest in the company, (2) prefer him over other members in certain distributions by the company, and (3) undertake that he would not be required to personally guarantee the contemplated bank loan. It is undisputed that Dye promptly paid this consideration. While the contract further provided that Dye would execute the operating agreement as a new member, that requirement cannot be held to go to the "root of the contract."

In the first place, Dye was treated as a member from the beginning, even though he had not actually signed the operating agreement. As Malinay testified below, "Sandman always considered Mr. Dye a member. There's no ifs, ands, or buts about that." (Tr., Oct. 13, 1999, at 91.) According to Malinay, Dye simply failed to complete "some technical documentation which was the acknowledgment of the operating agreement." (*Id.*) Malinay's letter to Dye's attorney on February 27, 1997, more than six months after the contract, reflected that while Dye was established as a member, before any requested financial information could be provided to him, he needed only to perform the "proce-

16. Critics of the current law have suggested that in place of the two-step test for approving rejection, i.e., the "material breach" step and the "business judgment" step, a so-called "functional" test be applied by which the only test of rejection would be whether the contract benefits the value of the bankruptcy estate. *See* Jessica L. Kotary & Nicole L. Inman, *Eliminating "Executory" from Section 365: The National Bankruptcy Review Commission's Panacea For an Ailing Statute,* 5 Am. Bankr.Inst. L.Rev. 513, 517–18 (1997).

17. I agree with the bankruptcy court that Sandman was the contracting party to the July 18, 1996, contract rather than the members of Sandman, as contended by Dye. Dye argues that it was legally impossible for Sandman to grant him a membership interest, but I find no such impossibility. A plain reading of the contract shows that Sandman was in-

tended to be a contracting party. The Virginia Limited Liability Company Act provides that a membership interest may be acquired directly from the limited liability company, *see* Va.Code Ann. § 13.1–1038.1.A.1. (Michie 1999), and the operating agreement here does not preclude that possibility, although it provides no specific procedure by which that might occur.

18. Contractual rights in bankruptcy proceedings are determined with reference to state law. *See Dunkley v. Rega Properties, Ltd. (In re Rega Properties, Ltd.),* 894 F.2d 1136, 1139 (9th Cir.1990). It is clear that the contract here was made in Virginia and was to be performed in Virginia, and thus Virginia law is to be applied in order to interpret it. *See Fournier Furniture, Inc. v. Waltz–Holst Blow Pipe Co.,* 980 F.Supp. 187, 189 n. 1 (W.D.Va. 1997).

dural requirement" of either signing the operating agreement or signing an agreement that the financial information to be supplied was confidential. (Hr'g, Oct. 13, 1999, Ex. 7.) Dye's attorney did in fact provide such a signed acknowledgment of confidentiality in his letter of December 9, 1997.

Moreover, the contract itself provided that Dye's membership was "subject to the terms and conditions of the [operating agreement]." (Hr'g, Oct. 13, 1999, Ex. 2.) Any separate acknowledgment of this fact by Dye was superfluous since he clearly had accepted the terms of the contract by his prompt payment of the $350,000 consideration. Neither state law nor Sandman's operating agreement required a new member like Dye to either execute the operating agreement or expressly agree to be bound by its terms.[19]

Finally, if any further acknowledgment was needed, Dye's attorney's letter of December 9, 1997, set forth an express acknowledgment on Dye's behalf that the operating agreement was to govern Dye's interest in Sandman.

█ Sandman has never pointed to any injury or damage it suffered by the failure of Dye to actually execute the operating agreement, nor is any apparent. At one point Dye was equivocal as to whether he was a member or not, but no harm came to Sandman from that early, temporary position. In determining whether a breach is material, the extent to which the non-breaching party is deprived of some benefit reasonably expected is an important consideration. *See* Restatement (Second) of Contracts § 241(a) (1981). Here, no actual benefit to Sandman was lost by Dye's failure to technically conform to the contract, and thus that failure was not material.

Sandman also argues that Dye's obligations were executory because the operating agreement provides that if any member agrees to guarantee an obligation of Sandman and is required to pay on such guarantee, that member is entitled to indemnification from other members. Moreover, members are restricted by the operating agreement from "making a market" in the membership interests. (Operating Agreement § 10.07, Stip. of Facts, Ex. 5.) Sandman contends that these continuing obligations of Dye mean that the contract was executory.[20]

These obligations were required by the operating agreement, however, and not by the contract of July 18, 1996, which is the only contract Sandman seeks to reject. Since I hold that, as a matter of law, the July 18, 1996, contract was not executory, it is unnecessary to reach the question of whether the rejection met the sound business judgment test.[21] I will reverse the decision of the bankruptcy court approving the rejection of the Dye contract.

**IV**

In the other consolidated appeal, Dye asserts that the bankruptcy court erred in approving the interim fee petitions, arguing that much of the time incurred by the debtor's attorneys was spent in the inter-

---

**19.** The operating agreement does provide that a transferee of another member's interest who wishes to become a member must "become[ ] a party to this Agreement as a Member and execute[ ] such documents and instruments as the Manager or Managers may reasonably request as may be necessary or appropriate to confirm the transferee as a Member in the Company and the transferee's agreement to be bound by the terms and conditions hereof." Operating Agreement § 10.06(c) (Stip. of Facts, Ex. 5.) Dye, however, was not a transferee from a member, but obtained his interest directly from Sandman. Moreover, as explained above, the contract itself con-

firmed that Dye's membership would be subject to the operating agreement.

**20.** The bankruptcy court did not rely on these obligations in its decision; it relied solely on Dye's obligation to execute the operating agreement.

**21.** It is also unnecessary for me to reach the other grounds urged by the appellant, namely, that the bankruptcy court should have abstained from deciding the question and that there was a lack of proper notice of the motion to reject.

ests of the other members, and not in the company's interests. Giving proper deference to the bankruptcy court's decision, however, I find that its orders in this respect are not assailable.

■ The applicable statute provides that in awarding compensation for services to counsel for a debtor, the court should consider "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title." 11 U.S.C.A. § 330(a)(3)(C) (West Supp.2000). The bankruptcy court found that the services by the debtor's law firm were rendered in an effort to clarify the ability of the debtor "to be an ongoing entity" and thus were compensable. (Tr., Oct. 13, 1999, at 153.) This finding is reviewed under a clearly erroneous standard. *See Anderson v. Anderson (In re Anderson)*, 936 F.2d 199, 203 (5th Cir.1991).

■ While it is true that much of the time spent by the firm concerned the question of Dye's membership in the debtor, I cannot say that the bankruptcy court was clearly in error in determining that the resolution of the issues surrounding that membership would assist the reorganization proceeding. Perhaps Sandman would have been better off if it had not attempted to reject Dye's contract, but it is uncontested that Dye's lawsuit caused the company to lose a bank loan commitment, and it is not beyond reason that the removal of a member such as Dye would better enable this closely-held business enterprise to be successful.

Accordingly, I will affirm the bankruptcy court's orders approving the interim fee applications.

## V

Final judgments will be entered in these appeals in accord with the foregoing opinion.