**In re HOLMES ENVIRONMENTAL, INC., Debtor.**

**Holmes Environmental, Inc., Plaintiff,**

v.

**Suntrust Banks, Inc. and Hazmed, Inc., Defendants.**

**Bankruptcy No. 02–70034–S. Adversary No. 02–07029–S.**

United States Bankruptcy Court, E.D. Virginia, Norfolk Division.

July 18, 2002.

Richard E. Biemiller, Wolcott, Rivers, Wheary, Basnight & Kelly, Virginia Beach, VA, for Holmes Environmental, Inc.

Debera F. Conlon, Office of the U.S. Trustee, Norfolk, VA, for U.S. Trustee.

Andrew J. Dolson, Richmond, VA, for Sun Trust Bank.

John D. McIntyre, Willcox & Savage, P.C., Norfolk, VA, for Hazmed, Inc.

## MEMORANDUM OPINION AND ORDER

STEPHEN C. ST. JOHN, Bankruptcy Judge.

These matters came on for hearing and trial, respectively, on May 28, 2002 on the Motion to Reject Executory Contract ("Motion") and the Amended Complaint for Turnover of Proceeds pursuant to 11 U.S.C. § 542 ("Amended Complaint"), each filed by the debtor. After the conclusion of the hearing and trial, the Court took both the Motion and the Amended Complaint under advisement. This Memorandum constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.[1]

## FINDINGS OF FACT

Holmes Environmental, Inc. ("Holmes") filed for relief pursuant to Chapter 11 of the United States Bankruptcy Code in this Court on January 2, 2002.[2] On February 28, 2002, Holmes filed the Motion, which sought the entry of an order rejecting a certain escrow agreement between Holmes and Hazmed, Inc. ("Hazmed"). The Motion alleged, among other things, that on or about March 23, 2001, Holmes and Hazmed entered into an escrow agreement, which provided for a payment arrangement in connection with work performed by Hazmed under a subcontract agreement between Holmes and Hazmed. Motion, ¶ 5. ("Escrow Agreement"). Holmes also alleged that, incident to the Escrow Agreement, Holmes executed an instrument of assignment ("Instrument of Assignment") which, among other things, assigned proceeds payable by the United States of America Army Corps of Engineers, Louisville District ("Corps") to Suntrust Bank, Inc. ("Suntrust") in connection with a certain contract between Holmes and the Corps, pursuant to which the subcontract agreement with Hazmed was executed ("Subcontract"). Motion, ¶ 6. Asserting that the Subcontract between Holmes and Hazmed expired by its terms on December 21, 2001, Holmes determined it to be in its best interest to reject the Escrow Agreement. Motion, ¶¶ 7, 8. Hazmed responded in opposition to the Motion, contending that the Escrow Agreement and the Instrument of Assignment are not executory agreements. A hearing on the Motion was scheduled for April 11, 2002.

Meanwhile, Holmes filed a Complaint against Hazmed and Suntrust on March 14, 2002. The original Complaint alleged that monies funded into escrow with Suntrust by the Corps pursuant to the Escrow Agreement constitute property of estate to which Hazmed has no title or lien.

---

1. This Court's law clerk, Jason S. Naunas, has previously accepted future employment at one of the law firms appearing as counsel here for Hazmed. Accordingly, Mr. Naunas is recused from these matters and has not participated in any manner in the adjudication of the Motion or the Amended Complaint.

2. Because of the failure of the debtor to timely cure certain filing deficiencies, pursuant to the provisions of Local Bankruptcy Rule 5005–1(E) this case was dismissed on January 22, 2002. The debtor moved to vacate the dismissal order and on March 1, 2002, an order was entered by this Court vacating the earlier dismissal and reinstating the case. The Motion was filed after the Court had orally granted the motion to vacate but prior to the entry of its written order on March 1, 2002.

Holmes prayed that this Court order Suntrust to turnover all of the escrowed funds to Holmes.[3] The Amended Complaint was filed by Holmes on April 18, 2002.[4] The Amended Complaint, in addition to seeking entry of an order authorizing Suntrust to turnover the monies held by it pursuant to the Escrow Agreement, alleged that the Instrument of Assignment pursuant to the Federal Assignment of Claims Act under which Holmes assigned to Suntrust for deposit into the escrow account the payments due Holmes under the contract with the Corps was not executed until October 8, 2001. Holmes further alleged that payment under the contract with the Corps was not remitted to Suntrust until January 15, 2002, after the date of filing of the petition in bankruptcy by Holmes. Accordingly, Holmes alleges that the execution of the Instrument of Assignment by Holmes was a transfer of the interest of Holmes in property within ninety days of the filing date and therefore is avoidable pursuant to 11 U.S.C. § 547. Alternatively, Holmes alleges the transfer of the funds due under the Corps contract to Suntrust on January 15, 2002 was on account of a pre-petition debt and therefore an avoidable post-petition transfer pursuant to 11 U.S.C. § 549.

Hazmed disputes the allegations of the Amended Complaint. First, Hazmed contends the Instrument of Assignment was executed on March 23, 2001 and not on October 8, 2001 as alleged by Holmes.

Hazmed also answers the Amended Complaint by asserting the funds held by Suntrust under the Escrow Agreement are subject to an express trust and are not property of the estate under 11 U.S.C. § 541. Alternatively, Hazmed argues the funds held by Suntrust are subject to a constructive trust and therefore are not estate property. Lastly, should the Court find any of the transfer here to be preferential, Hazmed asserts that it is entitled to a new value defense under 11 U.S.C. § 547(C)(4) to the extent of the value of the services provided to Holmes by Hazmed subsequent to the execution of the Instrument of Assignment.[5]

Little appears to be factually disputed between Holmes and Hazmed other than the date of execution of the Instrument of Assignment. Holmes is an environmental remediation and training contractor with its principal place of business in Norfolk, Virginia. Amended Complaint, ¶ 1. Ethel Holmes ("Ms. Holmes") is president of Holmes. She was approached by Ms. Jackie Sales, president of Hazmed ("Ms. Sales"), about the possibility of bidding various construction management contracts with the Corps. Holmes and Hazmed executed a teaming agreement dated September 29, 2000, where Holmes and Hazmed agreed to attempt to procure contract work from the Corps. Holmes and Hazmed worked together on a bid proposal through the fall of 2000 and Holmes submitted a bid to the Corps for a certain

3. At the hearing on the Motion on April 11, 2002, the parties represented to the Court that the Complaint was then pending and resolution of the Motion and the Complaint involved consideration of the same factual evidence. For reasons of judicial economy, the Court accelerated the initial pre-trial conference on the Complaint and established May 28, 2002, as the trial date for the Complaint and the continued hearing date on the Motion.

4. The Amended Complaint was permitted by a consent order entered on May 8, 2002.

5. Suntrust has filed an answer to the Amended Complaint admitting it received a remittance in the amount of $351,254.26 and is without information to admit or deny the other allegations of the Amended Complaint. As the stakes holder here, Suntrust merely prays that this Court take no action in these proceedings to its detriment.

construction management job. In December 2000, Holmes was awarded a contract by the Corps ("Corps Contract"). Thereafter, Holmes and Hazmed entered into the Subcontract, where Hazmed would perform a portion of the work of the Corps Contract as a subcontractor. Bearing the date of February 8, 2001, the Subcontract was executed at a closing in Richmond, Virginia by Ms. Holmes on behalf of Holmes and Ms. Sales on behalf of Hazmed on March 22, 2001. The Subcontract contemplated an initial period of performance through December 21, 2001. Section 16.3 of the Subcontract provided for creation of an assignment of receivables to an escrow account:

> Contractor agrees to execute an assignment of receivables to an escrow account for the invoices processed under the Prime Contract. The bank will be instructed to pay the Subcontractor's invoices per disbursement schedule. A copy of each invoice will also be submitted to the bank along with a copy of the applicable disbursement schedule, indicating the amounts due and payable to each party. All bank service cost or fees associated with escrow account will be divided between the Contractor and Subcontractor according to the division of work.

Pl.Ex. 1, Def.Ex. 1, ¶ 16.3

The Escrow Agreement was executed on March 23, 2001 by Holmes and Hazmed. Ms. Sales insisted on an escrow agreement because her investigation of the finances of Holmes indicated Holmes did not have substantial financial strength. The Escrow Agreement recites the award of the Corps Contract, the making of the Subcontract and that Holmes "has assigned to Escrow Agent, pursuant to the provisions of the Assignment of Claims Act of 1940, as amended, ... certain payments to be made by U.S. Army Corps of Engineers Louisville District under the Prime Contract for the purpose of facilitating the payment to Vendor pursuant to the terms of the Agreement [the Subcontract]." Pl. Ex. 2, Def. Ex. 2, p. 1. The Escrow Agreement appointed Suntrust as escrow agent and provided the following as to its disbursement of monies paid by the Corps on the Corps Contract:

1. Appointment of Escrow Agent. [Holmes] and [Hazmed] hereby appoint Escrow Agent to act as the agent of such parties in accordance with the provisions of the Agreement and this Escrow Agreement, Escrow Agent accepts such appointment.

2. Submission of Invoices. [Hazmed] agrees that upon shipment to [Holmes] and issuance of its invoice to [Holmes], that it will promptly forward to the Escrow Agent a copy of the invoice. [Holmes] agrees that upon issuance of bill of lading or other commercial instrument evidencing delivery to a common carrier of the material purchased from [Hazmed], [Holmes] shall promptly invoice USACE Louisville District and provide a copy to [Hazmed] and the Escrow Agent, together with a letter in the form of Exhibit A (the Payment Instruction).

3. Receipt of Funds. Escrow Agent shall promptly deposit all payments received under the Prime Contract into a non-interest bearing account.

4. Disbursements. Upon receipt of payment under the Prime Contract, Escrow Agent will compare the payment Instructions received from [Holmes] against [Hazmed] invoice. Unless a discrepancy exists between the Payment Instructions received from [Holmes] and [Hazmed's] invoice, or unless Escrow Agent has

been notified by either [Hazmed] or [Holmes] of a discrepancy or of a default under the Agreement, Escrow Agent will disburse to [Hazmed], within 2 business days, the amount due [Hazmed]. Any funds remaining in the escrow account after payment to [Hazmed] will be paid to [Holmes] within 2 business days. Escrow Agent will notify [Holmes] and [Hazmed] of any discrepancy between the Payment Instructions and [Hazmed's] invoice or of any disagreement, adverse claim or demand it has received notice of and hold funds in accordance with Section II, paragraph 7 of this Agreement.

Id. ¶¶ I. 1–4. The Escrow Agreement also provided it was made and intended to be constructed under the laws of the Commonwealth of Virginia. Id., ¶ IV, 3.

While there is clarity as to the time and place of the execution of the Subcontract and the Escrow Agreement by Holmes and Hazmed, the circumstances of the execution of the contemplated Instrument of Assignment are in dispute. The Instrument of Assignment was the document to be forwarded to the Corps pursuant to the Assignment of Claims Act irrevocably assigning to Suntrust all monies due or to become due under the Corps Contract.[6]

Ms. Sales testified that the Instrument of Assignment was executed on March 23, 2001 in Richmond, Virginia simultaneously with the execution of the Subcontract and the Escrow Agreement. Yet, on cross-examination, Ms. Sales also testified that the chief financial officer for Hazmed, Frank Costa ("Costa") visited Holmes' offices on October 8, 2001 for two purposes, being the conduction of due diligence in the course of Hazmed's consideration of whether to purchase Holmes as well as bringing an instrument of assignment to be executed by Holmes. Ms. Holmes, on the other hand, recalls no other documents being signed at the March 23, 2001 closing other than the Subcontract and the Escrow Agreement. She believes the Instrument of Assignment was not executed until October 8, 2001, when Costa brought the document to Holmes for execution. The Instrument of Assignment Ms. Holmes recalls signing bears no corporate seal and is signed as "Ethel Holmes By: Holmes Environmental, Inc. Ethel M. Holmes, President." Pls. Ex. 3. This Instrument of Assignment also bears the typed date of March 23, 2001. Ms. Holmes and Costa forwarded this executed Instrument of Assignment to the Corps. On October 25, 2001, the Corps forwarded to Suntrust a Notice of Assignment, which was acknowl-

6. The Instrument of Assignment provides as follows:

For value received, and in accordance with the Assignment of Claims Act of 1940, as amended (31 U.S.C. Sec. 3727, 41 U.S.C. Sec. 15), the undersigned contractor, Holmes Environmental, Inc. Having its principal office Bel–Aire Building, 1600 E. Little Creek Road, Suite 308, Norfolk, VA 23518 as Assignor, does hereby assign irrevocably unto SunTrust Bank, having a principal office at 919 East Main Street, Attn: Escrow Administrator, Richmond, A 23219 as Assignee, all monies due or to become due under contract number DACA–01–D–0002, dated December 22, 2000, between Assignor and the United States of America, U.S. Army Corps of Engineers and any amendments thereof or additions thereto. Assignor states that no previous Assignment has been made, and no additional Assignment will be made under the said contract; and authorizes payment of monies now due or to e made to Assignee.

In Witness Whereof, Assignor has caused this Assignment to be executed this 23rd day of March, 2001, in its corporate name of Ethel Holmes its President, and its corporate seal to be affixed by Ethel M. Holmes, its Secretary, and duly attested by said officer by due authority.

edged on October 23, 2001 by Janet M. Henderzahs, Contracting Officer on behalf of the Corps ("Acknowledged Notice of Assignment."). This Acknowledged Notice of Assignment was executed on behalf of Suntrust by Emily J. Hare, corporate trust officer.

The mystery is deepened by the existence of copies of the Instrument of Assignment and the Notice of Assignment which are at variance with the Acknowledged Notice of Assignment and the Instrument of Assignment forwarded to the Corps in October 2001 ("October Instrument of Assignment"). This Instrument of Assignment offered into evidence by Hazmed appears to be the identical form document as the October Notice of Assignment and also bears the typed date of March 23, 2001. This document bears the corporate seal of Holmes and instead is executed "Holmes Environmental, Inc. By: Ethel M. Holmes, President." Def. Ex. 3. This document also bears no attestation signature. Ms. Sales testified this copy was not among the business records of Hazmed but was received from the Corps at her request. She offered no explanation of the circumstances under which she received this document. Furthermore, Deborah Dodson, corporate trust officer of Suntrust, sent a letter dated April 28, 2001 forwarding an executed Escrow Agreement and a Notice of Assignment bearing Deborah Dodson's name as signatory.[7] Pl. Ex. 13. Dodson's letter also notes: "[t]he contractor is responsible for signing the Instrument of Assignment and sending it, along with the Notice of Assignment, to the paying office of the Corps of Engineers. Please note that the Instrument of Assignment will need a Corporate Seal and a signature to attest to your position."

The course of the performance of the Corps Contract is not disputed. Work commenced and invoices were submitted to the Corps for payment. Hazmed would initially prepare the invoices and forward them to Holmes, who would add the hours worked by Holmes personnel to the invoice. Some were returned because of deficiencies in the submitted paperwork. Meanwhile, all of the monies from the invoices which were being paid by the Corps were sent directly to Holmes and were not paid into the escrow established at Suntrust.[8] Hazmed's concerns about the financial condition of Holmes proved to be well-founded, as Holmes, after receipt of the proceeds of the invoices for completed work on the Corps Contract, failed to pay Hazmed the full amounts it was due under the Subcontract.[9]

Despite these payment problems, Hazmed expressed an interest in possibly purchasing Holmes. Hazmed pursued these negotiations and conducted certain due diligence in the process of evaluating the appropriate purchase price for Holmes. These talks were ultimately unsuccessful as Holmes and Hazmed could not agree on a purchase price.

All of the paperwork relating to the Corps Contract for Holmes was handled by Bernard Key ("Key"), the bookkeeper for Holmes. Similarly, much of the responsibility for processing the documentation concerning the Corps Contract at Hazmed was done by Costa. Ironically,

---

7. This copy of the Notice of Assignment does not appear to bear any actual signature and, in handwritten form, corrects the signatory from "Debra Dawson" to "Deborah Dodson."

8. Ms. Holmes testified that April, May, June and July 2001 payments were made directly to Holmes and not paid into the escrow at Suntrust.

9. Ms. Holmes admitted that Holmes still owes Hazmed approximately $160,000.00 from invoices paid on the Corps Contract directly to Holmes.

both have now been discharged by their respective employers. Key apparently left the financial records of Holmes in some disarray, as a new outside bookkeeper is now attempting to reconstruct many of the financial records of Holmes.

Holmes' financial condition all the while continued to deteriorate. By October 8, 2001, Holmes owed creditors in excess of $300,000.00 as well as having an arrearage on its tax payments of $130,000.00 to $140,000.00. Because of the payment problems with Holmes in late 2001, Hazmed initiated a motion for judgment against Holmes in state court. Holmes filed for relief in this Court on January 2, 2002. The Corps on January 15, 2002, made a disbursement of monies due under the Corps Contract to Suntrust, which Suntrust deposited into the escrow account established by the Escrow Agreement. This payment by the Corps, which represented payment on several months of invoices, totaled $351,254.26. Ms. Holmes admitted at trial that, of the amount on deposit at Suntrust, only the sum of $21,622.00 represented monies owed to Holmes and, accordingly, the remainder of $329,632.26 are monies owed to Hazmed for its performance of work under the Subcontract. From April 1, 2001 through September 30, 2001, Hazmed invoiced Holmes for reimbursement of costs incurred in the performance of he Subcontract in the amount of $77,986.84. Pl.Ex. 10. From October 2, 2001 through January 31, 2002, Hazmed invoiced Holmes for reimbursement of costs incurred in their performance of the Subcontract in the amount of $31,990.04. *Id.*[10] Apparently, the work on the Corps Contract has now been fully performed, but monies remain unpaid as the Corps is awaiting certain information in order to pay the final invoices submitted on the Corps Contract.

This one disputed factual issue of when the Instrument of Assignment was executed requires resolution, as Holmes' contention that the transfer of monies to Suntrust is a preference avoidable under 11 U.S.C. § 547 initially rises or falls based on this Court's conclusion as to when the Instrument of Assignment was executed. Holmes contends the Instrument of Assignment was signed not until October 8, 2001, within ninety days of its filing for bankruptcy. Hazmed instead contends the Instrument of Assignment was signed on March 23, 2001 simultaneously with the execution of the Escrow Agreement and the Subcontract, well outside of the ninety day preference window.[11]

Despite the directly contradictory testimony of Ms. Holmes and Ms. Sales as to the date of execution of the Instrument of Assignment, this much appears certain: the Corps did not acknowledge the receipt of a Notice of Assignment of Claims until October 23, 2001. Pls. Ex. 13. This is also apparent from the fact the initial payments under the Corps Contract during the spring and summer of 2001 were made directly to Holmes and not to the escrow established at Suntrust. Had the Corps received either an Instrument of Assignment or a Notice of Assignment prior to October 23, 2001, it presumably would have acted upon these instruments and begun forwarding payments on the Corps Contract to Suntrust and not to Holmes. Accordingly, the Court is satisfied the

---

10. Ms. Sales testified that Hazmed is owed a total of $722,359.26 by Holmes. Hazmed has not as yet filed a proof of claim in this case.

11. Obviously, even if the Instrument of Assignment was executed on October 8, 2001, it remains to be determined whether the necessary elements to establish a preference have been proven, or if any of the defenses of Hazmed prevent recovery.

Corps did not actually receive an executed Instrument of Assignment until sometime in October 2001. However, this conclusion does not preclude finding that the Instrument of Assignment was executed on March 23, 2001, as Ms. Sales testified, but never forwarded to the Corps by Holmes. This theory may be supported by an "Administrative Progress Report for the week ending 04/28/01–05/11/01," made by Costa, which notes "I have followed up with Ethel Holmes regarding the completed Instrument of Assignment and Notice of Assignment for the Louisville Corps contract." Def. Ex. 3.[12]

However, while the execution of the Instrument of Assignment on March 23, 2001 and the subsequent failure of presumably Key to forward it to the Corps has some support in the evidence, it appears the greater weight of the evidence supports the conclusion that the Instrument of Assignment was executed on October 8, 2001, as testified by Ms. Holmes. Ms. Sales specifically testified that Costa went to Holmes' office, among other things, to bring an Instrument of Assignment to be signed. The evidence of the other copy of the Instrument of Assignment executed slightly differently from the Instrument of Assignment executed on October 8, 2001 is simply too fragmentary to contradict this finding. While Ms. Sales stated she obtained this copy of the Instrument of Assignment from the Corps, she provided no other details of this investigation, such as why and when she requested this document, who at the Corps provided same or

what file at the Corps contained this version of the Instrument of Assignment.[13]

Ms. Sales likewise fails to provide any additional details to her conclusive recollection that the Instrument of Assignment was executed on March 23, 2001 at the closing in Richmond, Virginia. Comparing this uncertainty against the greater certainty that the Acknowledged Instrument of Assignment was executed on October 8, 2001 on the occasion of Costa's trip to Holmes, it appears the weight of the evidence at trial persuades this Court that the Instrument of Assignment was not executed until October 8, 2001.

It remains, however, to determine what legal import, if any, this factual conclusion has in determining whether (1) a preferential transfer or post-petition transfer has occurred which are voidable; (2) whether the proceeds of the Corps Contract now held by Suntrust, or any portion thereof, is property of the estate of Holmes pursuant to 11 U.S.C. § 541; and (3) is the Escrow Agreement an executory contract pursuant to 11 U.S.C. § 365 which Holmes may reject. Holmes contends that a transfer of the interest of Holmes in property occurred at the time of the execution of the Instrument of Assignment on October 8, 2001 and that all of the other elements of an avoidable preferential transfer are shown by the evidence. Holmes also alternatively contends the payment of monies by the Corps to Suntrust on January 15, 2002 after filing of its petition in bankruptcy constitutes an avoidable post-petition transfer pursuant to 11 U.S.C. § 550. Holmes finally contends that sufficient

12. This document continues, noting that "Ethel [Holmes] indicated that she was having Bernard [Key] forward the documents to the contracting officer at Louisville." Def. Ex. 3.

13. Given the fact the Corps appeared to act promptly in acknowledging the Notice of Assignment after its receipt in October 2001,

Ms. Sales' contention the deviant Instrument of Assignment was obtained from the files of the Corps begs the obvious question, if the Corps had an Instrument of Assignment prior to October 2001, why did it not acknowledge it and begin paying the Corps Contract proceeds to Suntrust?

duties remain to be performed by Holmes and Hazmed under the Escrow Agreement that it remains executory and thus may be rejected by Holmes pursuant to 11 U.S.C. § 365. Hazmed disagrees in each instance, contending that the circumstances here show that either an express or constructive trust in the escrowed monies was created for the benefit of Hazmed, which prevents the funds held by Suntrust to be property of the estate pursuant to 11 U.S.C. § 541 and further precludes the finding that any of the transfers here were preferential. Hazmed also believes that the remaining duties under the Escrow Agreement are insignificant and the Escrow Agreement therefore is no longer executory and therefore may not be avoided pursuant to 11 U.S.C. § 365. We address each of these arguments in turn.

## I

### Property of the Estate and An Avoidable Preference

#### A.

### Express Trust

■ The Bankruptcy Code defines the scope of property within the bankruptcy estate broadly, and includes within the estate "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1)(West.Supp.2002). Despite this breadth, expressly excluded from the estate is any "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ..." 11 U.S.C. § 541(d)(West.Supp.2002). The purpose of this exclusion is to ensure that the trustee "take no greater rights [in the property] than the debtor himself had." *Old Republic Nat. Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 721 (4th Cir. 1998), (quoting *Mid–Atlantic Supply, Inc. v. Three Rivers Aluminum Co.*, 790 F.2d 1121, 1124 (4th Cir.1986)). Therefore, when a "debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate' " for purposes of the Bankruptcy Code. *In re Dameron*, 155 F.3d at 721, (quoting *Begier v. IRS*, 496 U.S. 53, 59, 110 S.Ct. 2258, 110 L.Ed.2d 46(1990)). What constitutes an "equitable interest" subject to exclusion from the bankruptcy estate is a question of state law. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). As the Fourth Circuit Court of Appeals has observed: "[w]hile federal law creates the bankruptcy estate, *Butner* and the cases following it establish that state law, absent a countervailing federal interest, determines whether a given property falls within this federal framework." *American Bankers Ins. Co. v. Maness*, 101 F.3d 358, 363 (4th Cir.1996). Whether a trust has been established is generally a question to be resolved under the law of the state that is the *situs* of the trust fund. *Kupetz v. United States (In re California Trade Technical Schools, Inc.)*, 923 F.2d 641, 646 (9th Cir.1991), (citing, *Altura Partnership v. Breninc, Inc. (In re B.I. Financial Services Group, Inc.)*, 854 F.2d 351, 354 (9th Cir.1988)). Here, Holmes and Hazmed stipulated in the Escrow Agreement that it would be governed by the laws of the Commonwealth of Virginia. The intent of the parties for determination of a contract will be given effect except under exceptional circumstances evincing a purpose in making the contract to commit a fraud on the law. *Tate v. Hain*, 181 Va. 402, 410, 25 S.E.2d 321, 324 (1943). Accordingly, we must look to Virginia law to determine whether a trust was created here under the circumstances of these transactions between Holmes and Hazmed.

*In re Dameron* has succinctly summarized the law of trusts of Virginia:

Virginia law recognizes three basic forms of trust. *See Leonard v. Counts,*

221 Va. 582, 272 S.E.2d 190, 194–95 (1980) (discussing express, constructive, and resulting trusts). Of these, the two that are potentially relevant to the instant case are the express (or actual) trust and the constructive trust. An express trust is created when the parties affirmatively manifest an intention that certain property be held in trust for the benefit of a third party. *See Peal v. Luther,* 199 Va. 35, 97 S.E.2d 668, 669 (1957); *Broaddus v. Gresham,* 181 Va. 725, 26 S.E.2d 33, 35 (1943). An express trust may be created "without the use of technical words." *Broaddus,* 26 S.E.2d at 35. All that is necessary are words, *see id.* at 35 (citation omitted), or circumstances, *see Woods v. Stull,* 182 Va. 888, 30 S.E.2d 675, 682 (1944) (citation omitted), "which unequivocally show an intention that the legal estate was vested in one person, to be held in some manner or for some purpose on behalf of another . . . ," *Broaddus,* 26 S.E.2d at 35: *see also Schloss v. Powell,* 93 F.2d 518, 519 (4th Cir.1938). In contrast to an express trust, a constructive trust "arise[s] by operation of law, independently of the intention of the parties. . . ." *Crestar Bank v. Williams,* 250 Va. 198, 462 S.E.2d 333, 335 (1995) (citation omitted). Such trusts "occur not only where the property has been acquired by a fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained. . . ." *Leonard,* 272 S.E.2d at 194–95 (citation omitted). With either form of trust, Virginia law recognizes the beneficiary as "equitable owner of the trust property." *Broaddus,* 26 S.E.2d at 36 (quoting Austin W. Scott, Scott on Trusts § 12.1, at 86).

*In re Dameron,* 155 F.3d at 722.

*In re Dameron* is illustrative of circumstances where an express trust was found to have been created which precluded the inclusion of monies as estate property. There the debtor was a former attorney who received funds from various lenders to be held for disbursements to designated third parties following real estate closings. *Id.* at 718. Following the freezing of Dameron's accounts in a state court action, various lenders commenced an involuntary Chapter 11 petition and an adversary proceeding to recover their monies advanced to Dameron and held in the frozen accounts. Contending that the language of the real estate closing instructions created an escrow and an express trust, the Lenders sought exclusion of their advanced monies from the property of the estate.

The Fourth Circuit Court of Appeals agreed: "The language of the parties' agreements and the circumstances under which the Lenders advanced their funds to Dameron leave no doubt that the parties intended Dameron to act merely as intermediary." *In re Dameron,* 155 F.3d at 722. The Court also recognized that escrow agreements are, in fact, a type of express trust. *In re Dameron,* 155 F.3d at 723.

■ Courts in other jurisdictions have considered whether particular escrow arrangements are sufficient to exclude monies from the bankruptcy estate. Some courts have found that, in determining whether an escrow account is part of the debtor's estate, the nature and circumstances of the escrow agreement control. *O'Neil v. Shipman (In re Pratt and Whitney, Inc.),* 143 B.R. 19, 22 (Bankr.D.Conn. 1992). Factors that courts have found relevant "in this determination include, but are not limited to whether the debtor initiated and/or agreed to the creation of the escrow, what if any control the debtor exercises over it, the incipient source of it,

the nature of the funs put into it, the recipient of its remainder (if any), the target of all its benefit, and the purpose of its creation.'" *Id.*, (citing *Cedar Rapids Meats, Inc. v. Hager (In re Cedar Rapids Meats, Inc.)*, 121 B.R. 562, 567 (Bankr. N.D.Iowa 1990)). In analyzing escrow arrangements, courts have recognized that escrow agreements are distinguished from mere contracts:

> [A]n escrow is something more than a contract—it is a method of conveying property. When property is delivered in escrow the depositor loses control over it and an interest in the property passes to the ultimate grantee under the escrow agreement.

*Anderson County Bank v. Newton (In re All Chemical Isotope Enrichment, Inc.)*, 127 B.R. 829, 838 (Bankr.E.D.Tenn.1991), (citing *Carlson v. Farmers Home Administration (In re Newcomb)*, 744 F.2d 621, 624 (8th Cir.1984)).

As one court has observed, "[f]unds held in escrow or trust present difficult property of the estate questions for courts." *Cedar Rapids Meats, Inc. v. Hager (In re Cedar Rapids Meats, Inc.)*, 121 B.R. 562, 566 (Bankr.N.D.Iowa 1990). Cases have divided on the question of whether escrow funds are property of the estate. *Id.* However, "in cases where the agreement acted as an assurance or guarantee fund, courts have found that the escrow funds are not property of the estate." *Id. See, e.g., In re Dolphin Titan*, 93 B.R. 508, 511–12 (Bankr.S.D.Tex.1988) (monies placed in an escrow fund to assure payment of worker's compensation claims was not estate property); *In re Palm Beach Hgts. Dev. & Sales Corp.*, 52 B.R. 181, 183 (Bankr. S.D.Fla.1985) (monies placed by debtor in an escrow fund to guarantee the debtor would complete certain drainage and road improvement work was not property of the bankrupt estate).

The reasoning for such a conclusion has been succinctly summarized: "[f]or the court to release the fund to the Debtor would be contrary to the agreement between debtor and [the creditor], and convert Debtor's contingent right [to the fund] into a non-contingent right." *Dolphin Titan*, 93 B.R. at 512, (citing *In re Creative Data Forms, Inc.*, 41 B.R. 334, (Bankr. E.D.Pa.1984)).

We must analyze the circumstances here to conclude not only whether a trust was created by the escrow arrangement between Suntrust, Holmes and Hazmed, but perhaps more significantly, *when* a trust was created. Holmes appears to agree that ultimately a trust was formed here, but not until the Corps Contract payments were paid over to Suntrust on January 15, 2002, after the bankruptcy case was filed, or, at the earliest on October 8, 2001, when the October Instrument of Assignment was executed and ultimately forwarded to the Corps. Hazmed disagrees, believing the execution of the Escrow Agreement was sufficient to create an express trust for the monies ultimately paid over to Suntrust by the Corps.

■ A closer examination of the law of trusts in Virginia and elsewhere is necessary to resolve these questions. In Virginia, while it is essential to the creation of a trust that there be an explicit declaration of trust, or circumstance which show beyond a reasonable doubt that a trust was intended to be created, no formal, technical, or particular words are necessary. *Executive Comm. v. Shaver*, 146 Va. 73, 79, 135 S.E. 714, 715 (1926). Rather, it is sufficient if an intention to create a trust and the subject matter, purposes, and beneficiary are stated with reasonable certainty. *Id. See also Broaddus v. Gresham*, 181 Va. 725, 731, 26 S.E.2d 33,35(1943), (quoting *Hammond v. Ridley's Ex'r.*, 116 Va. 393, 398, 82 S.E. 102, 103 (1914)) (a

trust may only be created by words or circumstances "which unequivocally show an intention that the legal estate was vested in one person, to be held in some manner or for some purpose on behalf of another"), and *Schloss v. Powell*, 93 F.2d 518, 519 (4th Cir.1938). ("There is no doubt that money can be placed in the hands of one person for payment to another under such circumstances that a trust arises in favor of the latter which he may enforce; and this end may be accomplished by an express declaration of trust or by circumstances indicating an intention of the depositor to place the fund irrevocably beyond his control and devote it to the indicated purpose.")

The Virginia case law then requires an assessment of the intent of the parties; was there a sufficient manifestation of the intention of Holmes to place the portion of the Corps Contract earned directly by the efforts of Hazmed in March when the Subcontract and Escrow Agreement were executed, as Hazmed urges, or as Holmes argues, was there no intention to place the monies earned on the Corps Contract by Hazmed beyond Holmes' control until Oc-

tober when the October Instrument of Assignment was executed? A reading of the Subcontract and the Escrow Agreement appear to manifest the intention of Holmes that the monies earned by the provision of services under the Subcontract by Hazmed would be paid to Hazmed directly through their mutual agent, Suntrust Bank. Hazmed insisted upon the arrangement because Holmes finances were suspect and Hazmed feared it would not be paid for its work on the Corps Contract if all the contract proceeds were paid directly to Holmes.[14] Because the Corps will not recognize an assignment except as permitted by the Assignment of Claims Act, 41 U.S.C. § 15, *et seq.*, ("Assignment Act") no mechanism existed to pay Hazmed directly for its work except to assign the Corps Contract to a bank or trust institution. 26 U.S.C. § 15(b)(1996).[15]

The Escrow Agreement by its very terms contemplates the setting aside of the monies earned by Hazmed as a direct result of its labors on the Corps Contract. After submission of its invoice for work performed by it on the Corps Contract to Holmes, Hazmed would forward a copy of

**14.** This fear provided to be well-founded as Holmes still owes Hazmed approximately $175,000.00 from work performed by Hazmed and paid directly to Holmes by the Corps.

**15.** Section 15(b) of the Assignment of Claims Act of 1940 provides as follows:

(b) The provisions of subsection (a) shall not apply in any case in which the moneys due or to become due from the United States or from any agency or department thereof, under a contract providing for payments aggregating $1,000 or more, are assigned to a bank, trust company, or other financial institution, including any Federal lending agency, provided:

(1) That, in the case of any contract entered into after October 9, 1940, no claim shall be assigned if it arises under a contract which forbids such assignment.

(2) That, unless otherwise expressly permitted by such contract, any such assignment

shall cover all amounts payable under such contract and not already paid, shall not be made to more than one party, and shall not be subject to further assignment, except that any such assignment may be made to one party as agent or trustee for two or more parties participating in such financing.

(3) That in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of the assignment with—

(A) the contracting officer or the head of his department or agency;

(B) the surety or sureties upon the bond or bonds, if any, in connection with such contract; and

(C) the disbursing officer, if any, designated in such contract to make payment.

41 U.S.C. § 15(b) (2002).

the invoice to Suntrust as escrow agent. Pls.Ex. 2, ¶ 2. Holmes was to invoice the Corps and provide payment instructions to Suntrust. *Id.* Suntrust was charged with deposit of all payments received from the Corps Contract into a non-interest bearing account. Pls.Ex. 2, ¶ 3. Upon receipt of proceeds from the Corps, Suntrust would compare the payment instructions received from Hazmed. Pls.Ex. 2, ¶ 4. Suntrust would pay the amount due Hazmed unless a discrepancy existed between the payment instructions and the Hazmed invoices. *Id.* Any remaining amounts in the account would then be paid to Holmes. *Id.* While the Escrow Agreement does not use the terms "trust" or "in trust," it contemplates that the portion of the contract proceeds earned directly from Hazmed's labors would be paid to a third party, set aside, segregated and disbursed directly by the third party to Hazmed. Holmes would have no interest in the segregated funds except a reversionary interest in the monies not earned by Hazmed. These provisions, in combination with the references in the Escrow Agreement to the making of the Subcontract and the Instrument of Assignment,[16] are sufficient under Virginia law to establish an express trust of the monies earned under the Corps Contract by the efforts of Hazmed. The intention to place these monies beyond the control of Holmes appears plain.

Despite this language, Holmes argues that no trust could be formed under Virginia law unless and until the Instrument of Assignment was executed and monies ac-

tually transferred into the escrow account. Indeed, many cases stand for the proposition that in order to create a trust *inter vivos* in which the trustee is other than the settlor, the settlor ordinarily must make an *inter vivos* transfer of the trust property to the trustee. *See, e.g. Ballard v. McCoy,* 247 Va. 513, 517, 443 S.E.2d 146, 148 (1994)( citing Restatement (Second) of Trusts § 17 (1959) and Austin W. Scott & William F. Fratcher, The Law of Trusts § 17 (4th ed.1987)). The Restatement also recognizes that generally if a conveyance is not effective to transfer the intended trust property, a trust is not created.[17] Restatement (Second) of Trusts § 32 (1959). A distinction, however, appears to be made in instances where the trust is created non-gratuitously. The Restatement also provides that a trust may be created by a promise by one person to another person whose rights thereunder are to be held in trust for a third person. Restatement (Second) of Trusts § 17 (1959). The Comments to the Restatement elaborate:

> If a person makes an enforceable promise to pay money or to make a conveyance of property to another person as trustee, a trust may be created, the rights of the promisee being held by him as trustee, provided that the parties manifest an intention to create a present trust of the promisee's rights.

Restatement (Second) of Trusts, cmt § 17(3) (1959). The Comments to the tentative draft no. 1 of the Restatement

---

**16.** The Escrow Agreement references the making of the Instrument of Assignment in past tense, stating "[Holmes] has assigned to Escrow Agent, pursuant to the provisions of the Assignment of Claims Act of 1940, as amended ... certain payments to be made ..."

**17.** Section 32(1) of the Restatement (Second) of Trusts provides, in pertinent part:

> "[I]f the owner of property makes a conveyance *inter vivos* to another person to be held by him in trust for a third person and the conveyance is not effective to transfer the property, no trust of the property is created."

Restatement (Second) of Trusts, § 32(1) (1959).

(Third) of Trusts further clarify the distinction between enforceable and non-binding promises as to the timing of when a trust arises:

> Where a property owner makes a non-binding promise to create a trust in the future, no trust is thereby created. If the property owner later establishes the trust by *inter vivos* or testamentary transfer or by declaration, the trust is created by the transfer or declaration (see Comments d and e) and not by the promise. Similarly, when a property owner makes a contractually binding promise to establish a trust by *inter vivos* or testamentary transfer or by declaration and later performs by making the promised transfer or declaration, ordinarily the trust is created at the time of performance, whether the transfer or declaration is made voluntarily or involuntarily. In this situation the trust and the trustee's fiduciary duties ordinarily come into existence at the time of the settlor's performance and not at the time the binding promise is made.

> If, however, a person make or causes to be made an enforceable promise to pay money or transfer property to another as trustee, and if the person (with the expressed or implied acceptance of the intended trustee) also manifests an intention immediately to create a trust of the promisee's rights, a trust is created at the time of the contract, with a chose in action (the rights under that contract)

then being held for the beneficiaries by the trustee.

Restatement (Third) of Trusts, cmt § 10 (Tentative Draft No. 1 (1996)).[18]

While no Virginia case law appears to have addressed this specific exception to the general rule requiring delivery of the trust property, this Court believes the Virginia courts would follow the Restatement and conclude the present intention of Holmes to create a trust in the proceeds of the Corps Contract was sufficient to find an express trust was created at the execution of the Subcontract and the Escrow Agreement. Circumstances here leave little doubt that the creation of the trust with Suntrust was well supported by consideration. The evidence is not disputed that this payment arrangement was the *sine qua non* of the relationship of Hazmed with Holmes. The testimony of Ms. Sales makes it plain that Hazmed would not have entered into the Subcontract and performed the work thereon unless Holmes had made its promise to create the trust and escrow to ensure Hazmed would be paid for its work performed.[19]

This conclusion is further buttressed by an examination of the purpose of the Assignment Act, which provided the impetus for making of the Instrument of Transfer. The terms of the Instrument of Transfer provide it is being made in accordance with the Assignment Act. The Assignment Act was enacted to (1) prevent persons of influence from buying up claims against

---

**18.** The Comments to Section 15 of the Tentative Draft No. 1 of the Restatement (Third) of Trusts further elaborates on this concept:

> A promise to create a trust in the future is different from the situation in which the promisee of another's enforceable promise either declares that he or she holds the rights as promisee in trust or transfers those rights to another as trustee. In the latter types of cases, a trust is created at the time of the promisee's declaration or trans-

fer. The trust property in such a case is a chose in action; that is, the trust property is the promisee's rights under the promissory note or other contract.

Restatement of Trusts (Third), Cmt. § 15 (Tentative Draft No. 1 (1996)).

**19.** The Subcontract expressly references the establishment of an escrow account to pay Hazmed. Subcontract, §§ 16.3, 16.4.

the United States, which might then be improperly urged upon officers of the Government, (2) to prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, and to enable the Government to deal only with the original claimant, and (3) to save the United States defenses which if had to claims by an assignor by way of set-off, counter-claim, etc., which might not be applicable to an assignee. *U.S. v. Shannon,* 342 U.S. 288, 291–292, 72 S.Ct. 281, 283–284, 96 L.Ed. 321 (1952).

■ Accordingly, "[i]ts focus is not on the perfection of liens and security interests, but rather the establishment of procedural requirements of assignees planning to assert claims against the government." *In re Robert E. Derecktor of R.I., Inc.,* 142 B.R. 29, 30 (Bankr. D.R.I.1992). Thus, the Assignment Act imposes no additional requirements to achieve or preserve validity of a lien. *Id.; In re Richardson,* 216 B.R. 206, 213 (Bankr.S.D.Ohio 1997); *In re Metric Metals International, Inc.,* 20 B.R. 633, 635 (S.D.N.Y.1981). As compliance with the Assignment Act is unnecessary to perfect a lien between individual private parties, it is logical to conclude that such compliance would be unnecessary to create a trust, provided there has been an adequate manifestation of the parties of the intent to create a trust arrangement. Here the filing of the Instrument of Assignment with the Corps was doubtless necessary to induce the Corps to pay the Corps Contract proceeds to Suntrust for the benefit of Hazmed and not directly to Holmes. However, the timing of the execution of the Instrument of Transfer does not negate the clear intent of Holmes to set aside the monies earned by Hazmed on the Corps Contract as manifested in the Subcontract and the Escrow Agent. While the Instrument of

Transfer was necessary to protect the Corps under the Assignment Act and to induce it to pay Suntrust, it was not necessary to create the trust established by the Escrow Agreement. Rather, the intent to set aside the monies earned by Hazmed is adequately displayed in these earlier documents.

Holmes also relies upon decisions which suggest that a valid escrow may not be created until delivery of the escrowed property is made. In particular, Holmes cites to *Hooker Atlanta Corp. v. Hocker (In re Hooker Investments, Inc.),* 155 B.R. 332 (Bankr.S.D.N.Y.1993).

Atlanta Corporation sued Hooker to void as fraudulent the sale of an option contract and to recover monies paid as a broker's commission from an escrow account funded by Hooker. The court was required to consider "whether Hooker's deposit of $500,000.00 into the Lawyer's Title escrow account divested Hooker of control over those funds such that the subsequent transfer to [the broker] when the conditions of escrow were fulfilled could not be considered a transfer of the debtor's interest in property." *Id.,* 155 B.R. at 338. The court there concluded that an irrevocable transfer occurred when the monies in question were placed into escrow. From this, Holmes advocates there could be no escrow created here until execution of the Instrument of Assignment in October 2001 and that a valid escrow requires delivery of the property, which did not occur until after filing of the bankruptcy petition here. The principles articulated by the court in *Hooker,* while valid in the context there, are not applicable to the case at bar. At issue in *Hooker* was whether a debtor had retained control of an escrow created directly from the debtor's funds; here, instead, Holmes created an express trust from monies to be paid in the future by the Corps. *Hooker* provides no principles

which vary this Court's conclusion that Holmes evidenced its intent in March 2001 with the execution of the Subcontract and the Escrow Agreement to irrevocably place the amounts earned by Hazmed in its performance of duties on the Subcontract beyond Holmes' control, except for Holmes' duty to verify to Suntrust exactly what amount had been earned by Hazmed.

 What Holmes seeks to do here is to contradict the provisions of the Escrow Agreement and to convert their contingent right to receive any of the Corps Contract proceeds remaining after payment of all amounts due to Hazmed into ownership of one hundred percent of the fund.[20] This result would provide an enormous windfall to Holmes of $329,632.26, while reducing the undisputed amount owed to Hazmed to an unsecured, nonpriority claim. While the bankruptcy process by its application may operate to greatly reduce otherwise legitimate claims, this may not occur where a debtor substantially prior to its bankruptcy filing agrees to set aside property in trust for the benefit of a third party. Holmes agreed in March 2001 that Hazmed could be paid for its work performed on the Corps Contract without the financial risk of having the contract proceeds being paid first to Holmes. Hazmed bargained for this protection and Holmes manifested its intent that Hazmed be so paid when it executed the Subcontract and the Escrow Agreement. The Corps Contract proceeds now in the hands of Suntrust representing the payments for the work performed by Hazmed are therefore the *res* of an express trust created by Holmes, and may not be considered estate property pursuant to section 541 of the Bankruptcy Code.[21]

**20.** Based on undisputed testimony of Ms. Holmes, Holmes has earned $21,622.00 or 6.15 percent of the $351,254.26 now on deposit at Suntrust.

**21.** While the Court has concluded an express trust was created in March 2001 by the execution of the Escrow Agreement and the Subcontract, even if the Instrument of Transfer was necessary for a trust creation as Holmes contends, it appears that a constructive trust was created under Virginia law. In Virginia, constructive trusts occur not only where property has been acquired by a fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to principles of equity that it should be retained, at least for the acquirer's own benefit. *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron),* 206 B.R. 394, 400 (Bankr.E.D.Va.1997)(quoting *Leonard v. Counts,* 221 Va. 582, 272 S.E.2d at 190, 195 (1980)). The failure to transfer property for consideration intended to be in trust may create a constructive trust Austin W. Scott and William Fratcher, *The Law of Trusts,* § 31.4 (4th Ed.1987). The Fourth Circuit Court of Appeals and this court has recognized constructive trusts as property claims in bankruptcy. *See, e.g. Mid–Atlantic Supply Inc. of Va. v. Three Rivers Aluminum Co. (In re Mid–Atlantic Supply, Inc.),* 790 F.2d 1121, 1124–25 (4th Cir.1986); *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron),* 206 B.R. at 400; *Citizens Fed. Bank v. Cardian Mortgage Corp. (In re Cardian Mortgage Corp.),* 122 B.R. 255, 259 (Bankr.E.D.Va.1990); *In re Crotts,* 87 B.R. 418, 420–21 (Bankr.E.D.Va. 1988). While Holmes contends the decision in *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.),* 16 F.3d 1443 (6th Cir.1994) has influenced the Fourth Circuit Court of Appeals to reconsider the allowance of a constructive trust claim in bankruptcy, this court finds no decisions which suggest an abandonment of the *Mid-Atlantic Supply* holding that a constructive trust may be proven in bankruptcy where an identifiable *res* of money exists. See *In re Greenbelt Road Second Limited Partnership,* 1994 WL 592766 at *3 (4th Cir.1994)(unpublished decision)("the debtor's commingling putative trust funds with his own accounts if fatal to the imposition of a constructive trust"). Here where there is unquestionably a segregated, identifiable *res,* this Court believes that, should it subsequently be found by an appellate court that the execution of the Instrument of Transfer was necessary to create an express trust, nonetheless a constructive trust composed of the

## B.

## Preference

 Having concluded that an express trust was created in March 2001 at the execution of the Subcontract and the Escrow Agreement, and the monies paid into escrow by the Corps are therefore not estate property, it logically follows that no preferential transfer occurred here. As Justice Marshall has explained:

Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata share of the debtor's property. See, e.g., 11 U.S.C. § 726(b) (1982 ed.); H.R.Rep. No. 95–585, supra, at 177–178, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6138. Section 547(b) furthers this policy by permitting a trustee in bankruptcy to avoid certain preferential payments made before the debtor files for bankruptcy. This mechanism prevents the debtor from favoring one creditor over others by transferring property shortly before filing for bankruptcy. Of course, if the debtor transfers property that would not have been available for distribution to his creditors in a bankruptcy proceeding, the policy behind the avoidance power is not implicated. The reach of § 547(b)'s avoidance power is therefore limited to transfers of "property of the debtor."

Begier v. Internal Revenue Service, 496 U.S. 53, 58, 110 S.Ct. 2258, 2262–63, 110 L.Ed.2d 46 (1990). Here the funds in the escrow account representing the monies earned by the performance of Hazmed on the Corps Contract are not estate property; therefore, no preference can occur.

 Furthermore, no transfer occurred in the instant matter within the ninety day preference period. This Court has determined that an express trust of the monies earned by Hazmed on the Subcontract was created in March 2001 when the Escrow Account and the Subcontract were executed. Thus, "[t]o be avoidable a transfer must deprive the debtor's estate of something of value which could otherwise be used to satisfy creditors." Carlson v. Farmers Home Administration (In re Newcomb), 744 F.2d 621, 626 (8th Cir. 1984), (citing 4 Colliers on Bankruptcy ¶¶ 547,08[2], .20,21 (15th Ed.1984)). When an escrow or trust is created, the only interest left in the escrowed funds is a contingent right to any surplus after payment of the claims against the fund. Musso v. N.Y. State Higher Education Services Corp. (In re Royal Business School, Inc.), 157 B.R. 932, 940 (Bankr.E.D.N.Y. 1993), (citing Hooker Atlanta Corp. v. Hocker (In re Hooker Investments, Inc.), 155 B.R. at 338; In re Coco, 67 B.R. 365, 369 (Bankr.S.D.N.Y.1986)); In re O.P.M. Leasing Services, Inc., 46 B.R. 661 (Bankr. S.D.N.Y.1985). As such, the trust was created well before the ninety preference period prior to the filing here on January 2, 2001.[22]

Corps Contract proceeds earned by Hazmed was created in March 2001. This constructive trust would also operate to place the portion of the escrowed Corps Contract proceeds earned by Hazmed outside of the estate property of Holmes under § 541 of the Bankruptcy Code.

**22.** There is authority that a trust created other than from funds of the debtor within ninety days of film is not preferential because the funds in question did not constitute property of the debtor. In Greenwald v. Square D Co. (In re Trans–End Technology, Inc.), 228 B.R. 181 (Bankr.N.D.Ohio 1998), the court considered whether payments made to a subcontractor within ninety days of the contractor's bankruptcy filing were preferential. Finding that the funds in question were subject to a statutory trust created by Michigan law, the court there concluded "that the [Michigan] Trust Fund Act applies to the transfers at

This conclusion is further supported by consideration of when a transfer occurs for purposes of a preference. The Eighth Circuit Court of Appeals has explained when a transfer occurs when a trust or escrow is created:

> For purposes of preferential pre-petition transfers, a transfer is deemed made when it "takes effect between the transferor and the transferee" only if it is "perfected at, or within 10 days after, such time." Qq.S.C. 547(e)(2). A transfer of personalty is perfected "when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." 11 U.S.C. 547(e)(1)(B). The transfer that occurred when the escrow was created is a type of transfer for which no further perfection is possible or necessary. In terms of the Bankruptcy Code, the transfer was "perfected" when it took effect between the parties. *See generally, 4 Collier on Bankruptcy* ¶ 547.44 at 547–133 (15th ed.1984). Since it was perfected simultaneously, the transfer involved here is deemed made when the escrow was created.

*Carlson v. Farmers Home Administration (In re Newcomb),* 744 F.2d at 621, 626, n. 6. *See also Makoroff v. Allegheny Graphics, Inc. (In re Allegheny Label, Inc.),* 128 B.R. 947, 953 (Bankr.W.D.Pa.1991). Here the express trust was created greater than ninety days prior to bankruptcy, and the funds sought are not property of the estate of Holmes. Accordingly, the complaint to set aside the trust created here as a preference must fail.

## C.

### New Value

■ Having concluded that no preference took place, the defense of new value raised by Hazmed is therefore moot. However, in the event an appellate court should conclude otherwise, this Court will memorialize its findings concerning the defense of new value asserted by Hazmed.

■ Section 547(b) of the Code empowers a trustee to avoid certain transfers, known as "preferences," made within a ninety day period prior to the debtor's filing.[23] 11 U.S.C. § 547(b) (2001); *Advo–Sys., Inc. v. Maxway Corp.,* 37 F.3d 1044,

issue thereby preventing the funds from becoming property of the Debtor's bankruptcy estate" and, accordingly, no preferential transfer occurred even though the statutory trust was created and the monies paid to the subcontractor within the ninety day preference period. *Id.,* 228 B.R. at 185. *See also Selby v. Ford Motor Company,* 590 F.2d 642, 649 (6th Cir.1979) and *Huizinga v. U.S.,* 68 F.3d 139, 145 (6th Cir.1995). The court in *Trans–End* considered arguments by the trustee seeking avoidance that the broad powers of 11 U.S.C. § 547 can reach a trust created during the ninety day preference period, citing to *Alithochrome Corp. v. East Coast Finishing Sales Corp. (In re Alithochrome Corp.),* 53 B.R. 906 (Bankr.S.D.N.Y.1985) and *Torres v. Eastlick (In re North American Coin & Currency Ltd.),* 767 F.2d 1573, 1576, n. 2 (9th Cir.1985), amended by 774 F.2d 1390 (9th Cir.1985). In considering these decisions, the court found them distinguishable, in that "the trusts were either created from the debtor's

property or the court found that no trust had been created." *In re Trans–End Technology, Inc.,* 228 B.R. at 184. In contrast, the funds in question in *Trans–End* were paid by Ford [the project owner] to the debtor and therefore "[t]he trust arising in this case did not arise out of the debtor's funds." *Id.* As this Court has determined that an express trust was created in March 2001 by the execution of the Escrow Agreement and the Subcontract, the court need not rely on this authority to resolve the instant matter.

23. Section 547(b) provides:

> [T]he trustee may avoid any transfer of an interest of the debtor in property—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—

**384**

1045 (4th Cir.1994). As its legislative history bears out, the purpose of § 547(b) is two-fold: (1) to protect the debtor from a creditors' race to the courthouse and (2) to ensure the Code's policy of distributing the debtor's estate equally among its similarly situated creditors.[24] When these purposes are not served, however, a Trustee may not avoid certain transfers that otherwise meet the elements of a preference. *See Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc. (In re Fuel Oil Supply & Terminaling, Inc.)*, 837 F.2d 224, 227 (5th Cir.1988). One such exception is known as the new value defense, provided for in § 547(c):

> The trustee may not avoid under this section a transfer—
>> (1) to the extent such transfer was—
>>> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>>> (B) in fact a substantially contemporaneous exchange;

11 U.S.C. § 547(c)(1).

In *Cocolat, Inc. v. Fisher Development, Inc. (In re Cocolat, Inc.)*, 176 B.R.

540 (Bankr.N.D.Cal.1995), the court aptly stated the rationale of the new value defense:

> The purpose of the "new value" defense is to protect transactions that do not result in a diminution of the bankruptcy estate. A transfer does not diminish the estate if the estate receives "new value" on account of and equal to the amount of the transfer.

*Id.* at 548; *see also In re Fuel Oil Supply & Terminaling*, 837 F.2d at 228 ("This defense 'is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors.'" (quoting *In re Auto-Train Corp.*, 49 B.R. 605, 612 (Bankr. D.D.C.1985))); Thomas J. Palazzolo, Note, *New Value and Preference Avoidance in Bankruptcy*, WASH. U.L.Q. 875, 881 (1991) ("The exception's apparent rationale is that the transfer of new value offsets the preference. Thus, the debtor's estate is not depleted to the other creditors' detriment."). To establish the new value defense, the creditor essentially must prove

---

(A) on or within 90 days before the date of the filing of the petition; or
(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (2001).

**24.**

First by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter "the race of diligence" of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section-that of equality of distribution.

H.R. REP. No. 95–595, at 177–78 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6138.

three elements. *See* 11 U.S.C. § 547(g) (noting that the creditor bears the burden of proving the non-avoidability of a transfer under § 547(c)). First, the creditor must demonstrate that it is a "creditor to or for whose benefit such transfer was made." *Id.* § 547(c)(1)(A). Second, the creditor must show that it and the debtor had the requisite intent to make a contemporaneous exchange for new value. Third, the exchange must be in fact contemporaneous and for new value. *See In re Barefoot*, 952 F.2d 795, 800 (4th Cir.1991) ("In order for a creditor to successfully make out the [new value] defense, the creditor must prove both that the transfer was intended by the debtor and the creditor to be a contemporaneous exchange for new value and that in fact the transfer was a substantially contemporaneous exchange."). In the instant case, the first element is satisfied as Hazmed is a creditor for whose benefit the transfers at issue were made.

The second element regarding intent is typically the most crucial element in a new value defense. *See, e.g., In re Presidential Airways, Inc.*, 228 B.R. 594, 599 (Bankr. E.D.Va.1999) ("[T]he critical factor is whether the parties intended a contemporaneous exchange."). In *Lubman v. C.A. Guard Masonry Contractors, Inc. (In re GEM Constr. Corp.)*, No. 98–33110, Adv. 99–3047, 2000 WL 33321298 (Bankr. E.D.Va. Jan. 5, 2000) (unpublished), the court denied summary judgment on the new value defense in part because the parties disputed whether the transaction was contemporaneous. *Id.* at *4.

Intent may be gleaned from, *inter alia*, "the agreement or the course of dealings between parties ...." *Everlock Fastening Sys., Inc. v. Health Alliance Plan (In re Everlock Fastening Sys., Inc.)*, 171 B.R. 251, 255 (Bankr.E.D.Mich.1994). The requisite intent is evident from the Sub-

contract and the Escrow Agreement. These documents contemplate Hazmed will perform services and supply goods to perform those tasks under the Corps Contract as delegated to Hazmed by Holmes. In exchange for these goods and services, Hazmed is to be paid by the payment of the Corps Contract proceeds into the escrow established at Suntrust by the Escrow Agreement. Suntrust in turn would pay Hazmed the actual amount owed for its goods and services from the escrowed monies.

The final element is the determination of whether the exchange was contemporaneous and for new value. Section 547(c)(1) excepts transfers from the Trustee's avoidance powers only " 'to the extent' the transfer was a contemporaneous exchange for new value." *In re Robinson Bros. Drilling*, 877 F.2d at 34. The plain language of the Code establishes that new value contemplates a specific value that may be articulated in terms of "money or money's worth":

> "[N]ew value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2) (2001); *accord Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 733 (9th Cir.1994); *Creditor's Comm. v. Spada (In re Spada)*, 903 F.2d 971, 976 (3d Cir.1990); *In re Robinson Bros. Drilling*, 877 F.2d at 34 ("Moreover, the Bankruptcy Code's definition of the term 'new value' implies that the creditor must prove the specific valuation in 'money or money's worth in goods, services, or new credit.' "); *Jet Fla., Inc. v.*

*Am. Airlines, Inc. (In re Jet Fla. Sys.),* 861 F.2d 1555, 1559 (11th Cir.1988) (noting that the language of § 547(a)(2) "necessarily requires a specific dollar valuation of the 'new value'-the 'money's worth'-that the debtor received in the exchange"). In *Jet Florida Systems,* the Eleventh Circuit Court of Appeals concluded that the court therefore "must measure the value given to the creditor and the new value given to the debtor in determining the extent to which the trustee may void a contemporaneous exchange." *In re Jet Fla. Sys.,* 861 F.2d at 1558–59 (noting further that § 547(c)(1) "indicates that a creditor seeking [its] protection ... must prove with specificity the new value given to the debtor").

■ It is the creditor, as part of its new value defense, who must bear the burden of proving the specific valuation of the alleged new value. 11 U.S.C. § 547(g)(2002); *In re Robinson Bros. Drilling,* 877 F.2d at 34; *In re Jet Fla. Sys.,* 861 F.2d at 1559. Moreover, the alleged new value must be measured as of the time the preferential transfer took place. *In re Grand Chevrolet,* 25 F.3d at 733; *In re Robinson Bros. Drilling,* 877 F.2d at 33 (noting in the context of a § 547(c)(1) defense that "[c]onsequently, that the lien on the well may have had no value at the time of the adversary hearing was of no importance, so long as it had value at the time of transfer"); *In re Jet Fla. Sys.,* 861 F.2d at 1559 n. 5 ("The proper inquiry under § 547(c)(1) should be directed at the valuation of the transfer *when made.*"); *In re Cocolat,* 176 B.R. at 547.

In the instant case, Hazmed claims the new value it conferred was its performance under the Subcontract. To succeed, Hazmed must, in specific terms, prove the specific value of its performance under the Subcontract at the time of the preferential transfers.

■ Judge Derhy has explained the analysis required in the Fourth Circuit in evaluating new value exceptions:

The Fourth Circuit has adopted the *Garland* rule in analyzing § 547(c)(4). *In re Meredith Manor, Inc.,* 902 F.2d 257, 259 (4th Cir.1990) (citing *In re Thomas W. Garland, Inc.,* 19 B.R. 920 (Bankr.E.D.Mo.1982)). The *Garland* case modified the net result rule of § 547(c)by requiring new value to come *after* a preferential transfer. *In re Thomas W. Garland, Inc.,* 19 B.R. at 926. The Fourth Circuit consequently looks at the ninety day preference period and calculates the difference between the total preferences and the total advances, *provided that each advance is used to offset only prior preferential transfers. In re Meredith Manor, Inc.,* 902 F.2d at 259 (emphasis added). *Accord, e.g., In re Transport Associates, Inc.,* 171 B.R. 232, 238 (Bankr.W.D.Ky. 1994)("It protects a transfer from preference attack to the extent that a creditor *thereafter* replenishes the estate."); *In re IRFM, Inc.,* 144 B.R. 886, 892 (Bankr.C.D.Cal.1992), *aff'd,* 52 F.3d 228 (9th Cir.1995)("§ 547(c)(4)'s subsequent advance rule makes preferential transfers avoidable until offset by subsequent advances of new value."); *In re Amick,* 163 B.R. 589, 593 (Bankr.D.Idaho 1994)("[T]he grant of new value should apply to offset any preference, so long as the preferential payment was made before the new value was given.").

*Trinkoff v. Porters Supply Co., Inc. (In re Daedalean, Inc.),* 193 B.R. 204, 215 (Bankr.D.Md.1996). The new value exception may be satisfied by an indirect transfer of value via a third-party to a debtor rather than a direct transfer of value from creditor to debtor. *Lubman v. C.A.*

*Guard Masonry Contractor, Inc. (In re Gem Construction Corp. of Virginia, Inc.),* 262 B.R. 638, 646 (Bankr.E.D.Va.2000).

Applying this analysis to the instant matter, the total preferences allegedly occurring during the ninety day preference period[25] is measured by the value of the escrowed monies on deposit with Suntrust, which is in the sum of $351,254.26, less the $21,622.00 of the escrowed monies representing the amount of the contract proceeds that are directly the result of the provision of goods and services under the Corps Contract by Holmes and not by Hazmed.

Accordingly, the maximum amount of the alleged preference to Hazmed occasioned by the October 8, 2001 execution of the Instrument of Transfer is $351,254.26 less $21,622.00, or $329,632.26. The transfers of goods and services made after October 8, 2001 (the date of the alleged preference) is detailed in Exhibit 10 of Holmes, consisting of the various invoices of Hazmed to Holmes.

After October 1, 2001[26] and until completion of the Subcontract on January 31, 2002, Hazmed billed Holmes the sum of $317,992.04 for goods and services provided by Hazmed on the Corps Contract.[27] There appears to be no contest here that the value of the goods and services provided by Hazmed after October 1, 2001 is

$317.992.04, particularly since the Corps has now paid these component invoices and deposited the Corps Contract proceeds into the escrow account at Suntrust. Holmes has not chosen to dispute any of work performed by Hazmed after October 2001. None of the post-October invoices of Hazmed have been paid over to Hazmed. Thus, should a reviewing court subsequently find a trust here was not created until October 8, 2001 and that a preferential transfer did then occur, Hazmed is entitled pursuant to § 547(c)(4) of the Bankruptcy Code to a new value defense in the amount of $317,992.04, limiting the maximum amount of any preference recovery here to $11,640.22.

## II

### Post–Petition Transfer

 Holmes also seeks to avoid the Escrow Agreement by its contention that the actual transfer of monies into the escrow account did not occur until January 15, 2002, some thirteen days after the bankruptcy filing here. Therefore, Holmes believes the transfer of the monies to Suntrust as escrow agent is a post-petition transfer which may be avoided under the provisions of 11 U.S.C. § 549.

11 U.S.C. § 549(a) provides, in pertinent part that "... the trustee may avoid a

---

**25.** While no money was actually transferred during the ninety day preference period to Hazmed, it is the contention of Holmes that the making of the Instrument of Assignment on October 8, 2001 is the transfer which is preference which would enable Hazmed to claim its portion of the escrowed monies.

**26.** While the alleged preferential transfer took place on October 8, 2001, the invoice of Hazmed provide a total for the month of October dating from October 1, 2001. Because of the insubstantial difference of eight days, the Court will measure the new value transfers from October 1, 2001.

**27.** The invoices are as follows:

| | |
|---|---|
| October 1–October 31, 2001 | $ 93,791.32 |
| November 1–November 30, 2001 | $ 76,833.45 |
| December 1–December 31, 2001 | $ 62,824.72 |
| January 1–January 31, 2002 | $ 67,160.58 |
| January 1–January 31, 2002 | $ 298.83 |
| January 1–January 31, 2002 | $ 256.41 |
| January 1–January 31, 2002 | $ 16,824.93 |
| Total | $317,992.04 |

For reasons not explained at trial, Hazmed sent four separate invoices for work performed on the Corps Contract in January 2002.

transfer of property of the estate—(1) that occurs after the commencement of the case; and (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that is not authorized under this title or by the court." 11 U.S.C. § 549(a)(2002). Therefore, "the initial inquiry must be addressed to the threshold issue, which is whether or not the funds deposited in escrow by the debtor were properties of the estate on the date of the commencement of the case." *Gassen v. Universal Building Materials, Inc. (In re Berkley Multi–Units, Inc.),* 69 B.R. 638, 641 (Bankr.M.D.Fla.1987). If the funds in question are not property of the estate, the contention of the post-petition transfer condemned by § 549(a)(1) of the Bankruptcy Code is without merit. *Id.*

Here no post-petition transfer occurred because under any scenario the transfer of the beneficial interest in the monies to be earned by Hazmed on the Corps Contract occurred pre-petition. As this Court has found, the execution of the Escrow Agreement and the Subcontract in March 2001 evidenced the intent of Holmes to create a present trust of the monies to be earned by Hazmed in the performance of the Subcontract.[28] By agreeing to ultimately seg-

regate these monies when paid, Holmes created an express trust under Virginia law for the benefit of Hazmed and removed these monies as property of the estate pursuant to § 541 of the Bankruptcy Code. Accordingly, there is no postpetition transfer. However, even if the transfer did not occur until the October 8, 2001 execution of the Instrument of Transfer, then the trust creation was pre-petition as well.

Holmes contends there can be no escrow or trust created until the actual payment of the Corps Contract proceeds by the Corps to Suntrust which occurred postpetition. This argument ignores the fact that the Escrow Agreement and the Subcontract manifest a present intention that the monies earned by Hazmed are to be set aside exclusively for payment to Hazmed.[29] Here in March 2001 Holmes evidenced its irrevocable election to have Hazmed paid directly via Suntrust for its work performed on the Subcontract. Accordingly, any transfer which occurred did so substantially prior to the bankruptcy filing of Holmes, and the provisions of 11 U.S.C. § 549 provide no remedy here.[30]

---

28. See Part I., *supra.*

29. See Part I., *supra.*

30. The single decision which the Court has located which found an escrow fund transfer post-petition to be avoidable under Section 549 of the Bankruptcy Code is *Gassen v. Universal Building Materials, Inc. (In re Berkley Multi–Units, Inc.),* 69 B.R. 638 (Bankr. M.D.Fla.1987). There a purchase of real property was closed into escrow. At the final closing, title problems to the real property prevented disbursement of the escrowed monies from being disbursed. The commencement of a bankruptcy intervened. The court found the post-petition turnover of the escrow funds to be a transfer violative of § 549, because "there is hardly any doubt that the Debtor at the time had the right to elect not to proceed with the transaction and had the

right to elect not to proceed with the transaction and had a legal right to recover the funds placed in escrow and back out of the transaction." *Id.,* 69 B.R. at 642. The circumstances in the instant matter are markedly different. Here the trust created was not revocable. Segregation and direct payment of the Corps Contract proceeds earned by Hazmed was an express condition of the entry into the Subcontract by Hazmed. Holmes gave up control of the monies earned by Hazmed on the Corps Contract except for its role is verification to the escrow agent of the amounts actually earned by Hazmed. As such, the express trust created here is distinguishable from the events which led to a finding of an avoidable post-petition transfer in Berkley Multi–Units.

## III

### Executory Contract

██ Holmes seeks the approval of this Court pursuant to 11 U.S.C. § 365 to reject the Escrow Agreement. This motion requires visitation of "one of the most difficult areas of bankruptcy law"—the rejection of executory contracts permitted by Section 365 of the Bankruptcy Code." *Dye v. Sandman Associates, L.L.C.,* 251 B.R. 473, 480 (W.D.Va.2000), (quoting Michael T. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook,* 62 U.Colo.L.Rev.1, 1 (1991)). Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the Court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a) (2002). One of the potential rewards to a debtor of rejecting an executory contract lies in the fact that, once a contract is rejected, a damage claim arising as a result of the rejection becomes an unsecured claim against the debtor. *Stewart Foods, Inc. v. Broecker,* 64 F.3d 141, 144 (4th Cir.1995). Thus, if this Court were to permit Holmes to reject the Escrow Agreement, any claim of Hazmed arising from the rejection would be an unsecured claim to be paid pro-rata along with the other unsecured non-priority claims against Holmes. Hazmed likewise would lose any claim to the *res* of funds now accumulated in the escrow account maintained by Suntrust pursuant to the Escrow Agreement.

██ Despite bestowing this substantial authority on the debtor, the Bankruptcy Code provides no definition of what constitutes an "executory contract." Courts and scholars have devoted much effort to defining this critical term, with substantial conflict emerging in the case law and commentary. While this debate may rage on

elsewhere, the Fourth Circuit Court of Appeals has provided guidance, defining an executory contract as one "under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other." *Gloria Manufacturing Corp. v. International Ladies' Garment Workers' Union,* 734 F.2d 1020, 1022 (4th Cir.1984), (quoting Vern Countryman, *Executory Contracts in Bankruptcy, Part I,* 57 Minn. L.Rev. 439, 460 (1973)). *See also Andrews v. Riggs Nat'l Bank of Washington, D.C. (In re Andrews),* 80 F.3d 906, 914 (4th Cir.1996). Once a contract is found to be executory, it must then be determined whether rejection is advantageous to the debtor. *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1046 (4th Cir.1985). In this determination, the "sound business judgment rule" is applied. *Id.,* 756 F.2d at 1046–47. Under this maxim, the same deference is given to a decision to reject an executory contract as is given to other business management actions.

██ In determining whether a contract is so unperformed that failure to complete performance would be a material breach, it is appropriate to look to state law. *Dye v. Sandman Associates, L.L.C. (In re Sandman Associates, L.L.C.),* 251 B.R. 473, 482 n. 18 (W.D.Va.2000), (*citing Dunkley v. Rega Properties, Ltd. (In re Rega Properties, Ltd.),* 894 F.2d 1136, 1139 (9th Cir. 1990)). Given the parties choice of law that Virginia law should govern the Escrow Agreement,[31] the Court must look to Virginia law to determine whether the Escrow Agreement is so far unperformed that the non-performance of any remaining

---

31. Pls.Ex. 2, ¶ IV, 3.

duties by either Holmes or Hazmed would constitute a material breach. Judge Jones has provided a concise summary of Virginia law in this regard:

> Not every failure to perform a contractual obligation is a material breach that excuses performance by the non-breaching party. Rather, "the act failed to be performed must go to the root of the contract." *Neely v. White*, 177 Va. 358, 14 S.E.2d 337, 341 (1941). "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Horton v. Horton*, 254 Va. 111, 487 S.E.2d 200, 204 (1997). Viewing the principle another way, a breach of a contract cannot be material if the breaching party has rendered substantial performance, which is performance not in every detail, but in all essential parts. *See* 15 Richard A. Lord, *Williston on Contracts*, § 44.54 (4th ed.2000).

 Applying these teachings to the instant matter, the Escrow Agreement is not executory. It is undisputed that the work under Subcontract is complete, except for the submission by Holmes of invoices to the Corps for any unbilled work done by Hazmed. The Escrow Agreement was made in conjunction with the Subcontract and for the purpose of providing a vehicle to ensure Hazmed would be paid for its work performed on the Subcontract. Where a contract has been assigned and the underlying contract is sufficiently performed so as not to be executory, then the assignment may not be rejected as executory. *In re Braley*, 39 B.R. 133, 134 (Bankr.D.Vt.1984)("As the underlying loan contracts are not executory, performance by FHA having been completed, the exis-

tence of the Braley's duty to pay off the debt is the only performance that remains outstanding. The assignment is merely the vehicle through which repayment is to occur."). Furthermore, contracts are generally not executory where the only obligation remaining is to pay money. *In re Zenith Laboratories, Inc.*, 104 B.R. 667, 672 (Bankr.D.N.J.1989); *In re Kash & Karry Wholesale, Inc.*, 28 B.R. 66, 69 (Bankr.D.S.C.1982).

Holmes argues that mutual duties remain to be performed under the Escrow Agreement. However, the evidence here indicates little remains to be done under the Escrow Agreement but to pay over the monies owed to Hazmed for its work performed under the Subcontract and to forward any remaining invoices to Holmes. This is especially true given the admission, unchallenged by Hazmed at trial, that Holmes is entitled to but $21,622.00 of the monies now held in escrow. Accordingly, there are no duties remaining unperformed as to the monies now in escrow for either Holmes or Hazmed. The evidence that additional invoices need be submitted by Holmes to procure payment of the last unpaid monies under the Corps Contract, which presumably could activate the provisions requiring submission of the relevant invoices of Hazmed and payment instructions from Holmes to Suntrust, falls short as well. The breach by either Holmes or Hazmed of these requirements would not "go to the root of the contract," *Neely v. White*, 14 S.E.2d at 340, nor "defeat an essential purpose of the contract," *Horton v. Horton*, 487 S.E.2d at 204. The failure of either party to do these things likewise would be insufficient to excuse performance by the other nor create a reversion in the escrowed monies to Holmes.[32]

---

32. In the event either Holmes or Hazmed failed to provide, respectively, invoices or payment instructions to Suntrust, the escrow agent presumably would implead the monies into court and request a declaration of the parties' entitlement thereto.

Illustrative is the escrow agreement considered in *TTS, Inc. v. Citibank, N.A. (In re TTS, Inc.),* 158 B.R. 583 (D.Del.1993). There an escrow agreement created to provide deferred compensation to an employee was claimed by the debtor to be executory and subject to rejection. Among the remaining duties of the parties was the obligation of the employee to provide certification of death or retirement to the escrow agent. Such an ongoing duty was found not to be material:

> [The employee's] obligations regarding certification to the escrow agent before the escrow account is paid out is not a "material obligation" with respect to [the debtor]. [The employee's] failure to so certify consequently would not constitute a material breach of the escrow agreement which would entitle [the debtor] to recover the escrow account.

*Id.,* 158 B.R. at 588.

Performance under the Subcontract and the Escrow Agreement has been so substantial that the Escrow Agreement may not be deemed executory, and therefore, § 365 of the Bankruptcy Code provides no basis for rejection here by Holmes.

### Summary

1. The monies owed to Hazmed for its performance of services and the provision of goods under the Subcontract are subject to an express trust created for the benefit of Hazmed and are not property of the bankrupt estate of Holmes pursuant to Section 541 of the Bankruptcy Code.

2. As the monies earned by Hazmed on the Subcontract are not estate property, no preferential transfer occurred. No transfer here occurred within ninety days of the bankruptcy filing of Holmes, as the express trust in favor of Hazmed was created in March 2001.

3. In the event a reviewing appellate court should find that a preference did occur here, Hazmed is entitled to a new value defense in the amount of $317,992.04, representing the transfer of goods and services made by Hazmed for the benefit of Holmes on the Corps Contract subsequent to October 1, 2001.

4. There are no material duties remaining to be performed on the Escrow Agreement. Therefore, the Escrow Agreement is not executory and may not be rejected pursuant to 11 U.S.C. § 365.

It is, therefore, ORDERED that the Motion is denied and the Amended Complaint is DISMISSED.